## IN THE CHANCERY COURT OF HINDS COUNTY, MISSISSIPPI
### FIRST JUDICIAL DISTRICT

PIONEER HEALTH SERVICES, INC.                                          **PLAINTIFF**

V.                                                           CASE # G 2015 90

MISSISSIPPI DIVISION OF MEDICAID
OFFICE OF THE GOVERNOR, STATE OF
MISSISSIPPI                                        APR 13 2015

                                         EDDIE JEAN CARR, CHANCERY CLERK   **DEFENDANT**

                                    BY_____ D.C.

### COMPLAINT

Plaintiff Pioneer Health Services, Inc., by its attorneys Bradley Arant Boult Cummings,

LLP files this Complaint against the Mississippi Division of Medicaid, Office of the Governor,

State of Mississippi as follows.

### PARTIES

1.      Plaintiff Pioneer Health Services, Inc. ("Pioneer") is the owner/operator of rural

hospitals located in Mississippi as well as other states, among which is S.E. Lackey Memorial

Hospital ("Lackey"). The principal location for Lackey is 330 North Broad Street, Forest,

Mississippi 39074.

2.      Defendant Mississippi Division of Medicaid, Office of the Governor, State of

Mississippi ("Medicaid") is the state entity responsible for the administration of the federal-state

Medicaid program for the State of Mississippi. Defendant's principal office location is 550 High

Street, Suite 1000, Jackson, Mississippi 39201.

## JURISDICTION AND VENUE

3.      Jurisdiction and venue are proper in this Court because Medicaid's principal place of business is located in the First Judicial District of Hinds County.

## FACTS

4.      The Division of Medicaid is an administrative agency of the State of Mississippi responsible for administration of the federal-state Medicaid program. See, *Miss. Code Ann. § 43-13-107 (2014)*. It is well settled under Mississippi law that "administrative agencies have only such powers that are expressly granted to them or those necessarily implied via their grant of authority." See *Mississippi Pub. Serv. Comm'n v. Columbus & Grenville Railway Company*, 573 So.2d 1343, 1346 (Miss. 1990), citing *Pittman v. Mississippi Pub. Serv. Comm'n*, 538 So.2d 367, 373 (Miss. 1989). And, "any such power exercised by an administrative agency must be found within the four corners of the statute under which it operates." *Id.* at 1346, 1347, citing *Strong v. Bostick*, 420 So.2d 1356, 1361 (Miss. 1982); *Mississippi Milk Comm'n v. Winn Dixie*, 235 So.2d 684 (Miss. 1970).

5.      In addition to applicable state laws, through its State Plan, Medicaid is required to operate its program consistent with applicable federal laws. See, *Miss. Code Ann. § 43-13-121 (2014)*.

6.      Mississippi law requires that Medicaid make supplemental payments "to hospitals that serve a disproportionate share of low-income patients and that meet the federal requirements for those payments as provided in Section 1923 of the federal Social Security Act and any applicable regulations." See, *Miss. Code Ann. § 43-13-117(A)(18)(a) (2014)*.

7.      The Disproportionate Share Hospital ("DSH") payment program is commonly referred to as the DSH program or DSH payments.

8.      Federal law, Section 1001(d) of the Medicare Prescription Drug, Improvement and Modernization Act was amended in 2003 to require states to audit DSH payments to hospitals. The final regulations implementing this rule were published on December 19, 2008, with an effective date of January 19, 2009. Vol. 73, No. 245 Fed. Reg. 77904. In pertinent part, the rules are codified in 42 C.F.R. 455.300, et seq.

9.      The rules provide that the State must submit an "independent certified audit" to CMS for its DSH program each year and defines such as an audit "that is conducted by an auditor that operates independently from the Medicaid agency or subject hospitals and is eligible to perform the DSH audit.". See, *42 C.F.R. 455.301 and 42 CFR 455.304.*

10.     Additional DSH Audit guidance issued by CMS provides that CMS intends for the DSH auditor "to be fully able to render objective and impartial judgment on all matters relating to a required DSH audit." The guidance further describes that examples of potential conflicts for an audit entity would be "calculating a State's DSH payments under the Medicaid State Plan", "developing State plan DSH payment methodologies for States" and "possessing a direct or indirect financial interest in the State's Medicaid program". States are also instructed to explain why its chosen DSH audit firm "meets the GAGAS independence standards despite the appearance that the auditing firm is not independent". See, Exhibit A.

11.     Pursuant to a public records request, Medicaid produced no information to indicate that it has conducted such an examination or provided such explanation to CMS.

12.     Upon information and belief, Medicaid has contracted with Myers and Stauffer to provide administrative and technical support for its DSH program on an ongoing basis since 2006, including 2011 which is the period involved in the instant matter. See, Exhibit B.

13.     Effective 2013, and upon information and believe continuing through June 30, 2015, Medicaid contracted with Myers and Stauffer to perform the DSH audits for the 2011 plan year. See, Exhibit C.

14.     Myers and Stauffer performed the DSH audit for 2011 and determined that Lackey was paid $578,053 over its applicable DSH limit.

15.     On December 19, 2014, Medicaid notified Lackey of these findings and also notified Medicaid's fiscal agent, Xerox State Healthcare, to recoup $578,053 from future Medicaid payments to Lackey.

16.     Lackey properly filed an appeal with Medicaid, followed by a supplemental appeal which both raised, among other grounds, the argument that the DSH audit was invalid because the DSH auditor did not satisfy the definition of an independent certified auditor in accordance with federal law and regulation. See, Exhibit D.

17.     Medicaid has denied Lackey's appeal in part and granted its appeal in part. Lackey's appeal on the issue regarding auditor independence has been denied. See, Exhibit E.

## RELIEF REQUESTED

18.     Pioneer re-alleges the allegations in paragraphs 1 through 17.

19.     Pioneer alleges that Medicaid's DSH Audit program does not satisfy the requirements of federal law because Myers and Stauffer cannot be a certified independent auditor. Myers and Stauffer cannot audit the DSH payments made to hospitals under a payment methodology that it was responsible for administering and calculating the DSH payment amounts to hospitals.

20.     Pioneer alleges and requests the Court to find that by failing to provide a certified independent auditor, Medicaid's DSH audit program is not operating under the authority of law and does not comply with federal requirements. As such, it cannot perform the DSH audits and cannot seek recovery of overpayments from providers.

21.     Further, Pioneer alleges and requests the Court to find that the $578,053 overpayment demanded from Lackey should be withdrawn since the audit was performed without the authority of law.

22.     Pioneer requests that the Court order Medicaid to pay its reasonable attorney fees and court costs associated with filing this action and any other damages that this Court may deem appropriate in this matter.

WHEREFORE, Plaintiff Pioneer Health Services, respectfully requests that this Court enter an Order providing the relief requested above, and further requests that the Court award it any and all other relief to which it is entitled.

Dated: April 13, 2015

Respectfully Submitted,

T. Richard Roberson, Jr. (MSB #10745)
Bradley Arant Boult Cummings LLP
188 East Capitol Street, Suite 400
Jackson, Mississippi 39201
Telephone: 601.592.9910
Facsimile: 601.592.1410
Email: rroberson@babc.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument will be served on the Mississippi Division of Medicaid, along with the Summons and Complaint filed herein.

This, the 13th day of April, 2015.

T. Richard Roberson, Jr. (MSB# 10745)

## Additional Information on the DSH Reporting and Audit Requirements

### Best Available Information/Cost Report Procedures

**1. How can an independent auditor certify that DSH payments do not exceed the hospital-specific DSH limits if data used for calculating the limits is derived, at least in part, from as-filed Medicare cost reports?**

Certification means that the independent auditor engaged by the State follows the criteria of the Federal audit regulation and completes the verification, calculations and report under the professional rules and generally accepted standards of audit practice. This certification would include an assessment of the State's audit protocol to ensure that the Federal regulation is satisfied, an opinion for each verification detailed in the regulation, and a determination of whether or not the State made DSH payments that exceeded any hospital-specific DSH limit in the Medicaid State plan rate year under audit. The certification should also identify any data issues or other caveats that the auditor identified as impacting the results of the audit.

We expect that reports and audits will be based on the best available information. If audited Medicare cost reports are not available within the timeframe allowed for the reporting and audit submission, the DSH report and audit may need to be based on Medicare cost reports as filed. However, in the final rule, CMS modified the timeline for report and audit submission to allow States additional time for the inclusion of the most accurate and complete data possible. The required reports and audits may be submitted as late as the last day of the Federal fiscal year ending three years after the end of the Medicaid State plan rate year, with a special timing provision for the audits for 2005 and 2006, which will be due by December 31, 2009. Additionally, CMS has developed a General DSH Audit and Reporting Protocol that should assist States and auditors in utilizing information from each data source and developing methods to determine uncompensated costs of furnishing hospital services to the Medicaid and uninsured populations. The protocol is available on the CMS website at www.cms.hhs.gov/MedicaidGenInfo/Downloads/CMS2198FRptProtocol.pdf.

It should be noted that in light of States' concerns regarding budget cycles, planning complications, and the economic downturn, CMS has determined that it will apply a flexible enforcement strategy designed to ensure that States have sufficient time to properly implement the new requirements without undue hardship. Thus, CMS will not find a State to be out of compliance with the DSH reporting and auditing requirements for the initial (2005 and 2006) Medicaid State plan rate years until December 31, 2010. Pursuant to the provisions of the regulation, independent audits must begin with Medicaid State plan year 2005 and must be completed no later than September 30, 2009, for the State plan rate years 2005 and 2006. Audits and reports for State plan rate years 2005 and 2006 are due to CMS on or before December 31, 2009.



EXHIBIT

A

1

**2. If as-filed Medicare cost reports are used to calculate hospital-specific DSH limits, do limits have to be adjusted to reflect the final settlement of the cost report or the outcome of cost report appeals?**

We expect that reports and audits will be based on the best available information. If audited Medicare cost reports are not available, the DSH report and audit may need to be based on Medicare cost reports as filed. Most hospital cost reports are finalized within two years of the period being audited but there is always the possibility of post-audit adjustments. To the extent that such adjustments to cost reports affects Medicaid payments, States should notify CMS of the adjustments to the cost reports and any subsequent DSH audit report changes as well as make appropriate prior period adjustments through the MBES/CBES system. Additionally, we would anticipate the auditor's certification would identify any data issues or other caveats that the auditor has identified as impacting the results of the audit.

The statutory authority instructed States to report and audit specific payments and specific costs. Consistent with that provision, States must perform audits associated with defined periods of time and must identify the actual costs incurred and payments received during that defined time period. In order for the audits to properly measure these elements and in consideration of the many comments related to retroactivity and timing issues associated with gathering the data necessary to identify the costs and revenues, CMS has made several revisions to the final rule including identifying that: (i) the Medicaid State plan rate year 2005 is the first time period subject to the audit; and, (ii) the deadline on reporting the audit findings has been extended to at least three full years after the close of the Medicaid State plan rate year subject to audit.

The required reports and audits may be submitted as late as the last day of the Federal fiscal year ending three years after the end of the Medicaid State plan rate year, with a special timing provision for the audits for 2005 and 2006, which will be due by December 31, 2009. This three year period accommodates the one-year concern expressed in many comments regarding claims lags and is consistent with the varying cost report period and adjustments.

**3. Data derived from multiple cost report years might have to be used in fulfilling audit and reporting requirements for a given State plan rate year. In order to complete reporting and auditing requirements relating to State plan rate years 2005 and 2006, for the 2005 and 2006 reports, would it be acceptable to obtain 2004 and 2007 costs from submitted or unreviewed cost reports?**

In instances where the hospital financial and cost reporting periods differ from the Medicaid State plan rate year, States and auditors may need to evaluate multiple audited hospital financial reports and cost reports to fully cover the Medicaid State plan rate year under audit. Typically, at most, two financial and/or cost reports should provide the appropriate data. Please note that there are some circumstances where more than two cost reports are needed to cover a State plan year. Some occasions call for a hospital to file short-period cost reports within a normal 12-month cost reporting period. For example, if there is a change of ownership in the middle of a fiscal period, the hospital will have to file more than one cost report during its 12-month fiscal period. The data may need to be allocated based on the months covered by the financial or cost reporting

2

period that are included in the Medicaid State plan period under audit. CMS has developed a General DSH Audit and Reporting Protocol to assist States in using the information from each source identified above and developing the methods under which costs and revenues will be determined. The protocol is available on the CMS website at www.cms.hhs.gov/MedicaidGenInfo/Downloads/CMS2198FRptProtocol.pdf.

We expect that all reports and audits will be based on the best available information. If audited Medicare cost reports are not available, the DSH report and audit may need to be based on Medicare cost reports as filed. Moreover, in order to ensure a period for developing and refining audit practices, we are providing for a transition period through Medicaid State plan rate year 2010, before audit results will be given weight other than in making prospective estimates of hospital costs for the purposes of ongoing DSH payments.

### 4. Can independent auditors utilize a risk-based approach to auditing hospitals or utilize some materiality guideline in developing different levels of data analysis for different hospitals? Additionally, does CMS expect that all hospitals are audited by the independent auditor annually?

The DSH audit and report is a necessary part of the administration of the Medicaid program. The purpose of the audit is to ensure that States make DSH payments under their Medicaid program that are in compliance with section 1923 of the Act. The audit does not encompass the review of the State's overall Medicaid program; it simply ensures that one portion of the program is conducted in line with Federal statutory limits. In addition, the DSH audit will rely on financial and cost report data provided by hospitals that are subject to generally accepted accounting principles as part of their primary reporting function.

There is no statutory authorization for an exception to audit and reporting requirements with respect to hospitals that receive DSH payments. The audit and reporting requirements under section 1923(j) of the Act apply to all States that make DSH payments, with respect to each hospital receiving a DSH payment. The statute further requires that CMS obtain information sufficient to verify that such payments are appropriate. Relying on a sample of cost reports and financial information will not ensure that each DSH payment is appropriate and does not exceed the hospital-specific DSH limit.

The data elements necessary for the State to complete the DSH audit and report should, in part, be information the State already gathers to administer the DSH program. The responsibility of the auditor is to measure DSH payments received by a hospital in a particular year against the eligible uncompensated care costs of that hospital in that same year as determined using the data provided in the cost, utilization and financial reporting documents described in the preamble to the final rule. Additionally, auditing a State's overall DSH payment methodology will not ensure that DSH payments to each hospital do not exceed the statutorily required hospital-specific DSH limit.

Finally, in order to certify to the verifications, the auditors should follow generally accepted auditing practices and requirements to assure a thorough and complete audit has been conducted. The auditor must develop sufficient confidence in the data to certify the results for

3

the State plan rate year subject to the audit. The final rule does not eliminate any flexibility that independent auditors might have in using accepted professional methodologies to conduct the audit and to certify to the verifications. However, the independent certified audits required to be submitted must be performed in compliance with section 1923(j) and implementing regulations as a condition for receiving Federal payments under section 1903(a)(1) and 1923 of the Act.

**5. If DSH payments are based on hospital-specific DSH limits from prior year audits, recoupments and DSH payment redistribution might be necessary on an annual basis. How does CMS expect States to deal with this cost and with the potential hardship to the hospitals?**

This regulation does not require States to implement retrospective DSH payment methodologies or otherwise change the basic approach to DSH payment used by the States. Nor does it require delay in making DSH payments consistent with the authority of the approved Medicaid State plan. CMS recognizes that States may need to estimate uncompensated care to determine DSH payments in an upcoming Medicaid State plan rate year, indeed, this is currently the way most States distribute DSH payments. The regulation is intended to ensure that those estimates do not exceed the actual hospital-specific limit in the year in which the payments are received.

States retain considerable flexibility in setting DSH State plan payment methodologies to the extent that such methodologies are consistent with 1923(c) and all other applicable statute and regulations. This regulation provided for time frames that should provide States with accurate information with which to determine prospective DSH payments and time to review and adjust rates once actual eligible uncompensated care amounts are determined. States will have to determine how to best ensure that prospective DSH methodologies do not result in payments that exceed hospital-specific DSH limits, either by revising those methodologies or by providing for reconciliation of prospective payments with those limits. Because FFP is only available for DSH payments that do not exceed the hospital-specific limit, some States may determine that a retrospective DSH payment methodology or a DSH reconciliation is a reasonable way to manage its DSH allotment.

CMS as always is available to offer technical assistance to States in developing such methodologies. Additionally, CMS included a transition period in the regulation to ensure that States may adjust prospective estimates to avoid any immediate adverse fiscal impact.

**6. The final regulation requires a determination of whether or not the State made DSH payments that exceeded the hospital-specific DSH limit for any hospital in the Medicaid State plan rate year under audit. If the DSH audit identifies DSH payments made to a hospital in excess of the hospital-specific DSH limit, how should States treat such payments if the hospitals are no longer eligible for DSH, are bankrupt, or no longer exist?**

As stated in the final rule, beginning in Medicaid State plan rate year 2011, to the extent that audit findings demonstrate that DSH payments made in that year exceed the documented hospital-specific cost limits, CMS will regard them as representing discovery of overpayments to

providers that, pursuant to 42 CFR Part 433, Subpart F, triggers the return of the Federal share to the Federal government (unless the DSH payments are redistributed by the State to other qualifying hospitals as an integral part of the audit process). This is not a "penalty" but instead reflects adjustment of an overpayment that was not consistent with Federal statutory limits. However, we note that, to the extent that States wish to redistribute any DSH payments that exceeded a particular hospital-specific limit, the Federally approved Medicaid State plan must reflect that payment policy and allow for individual payment adjustments based on the audit. Further, States need not refund the Federal share of overpayments made to providers who are determined to be bankrupt or out of business in accordance with 42 CFR 433.318.

**7. To meet the reporting and auditing requirement, States must perform audits associated with defined periods of time and must identify the actual costs incurred and payments received during that defined time period. Can a State use adjudicated claims date, or must they change to admission or discharge date, which is reflected in the comment and response of the DSH final rule?**

Section 1923(g) of the Social Security Act imposes a limit that is based in part on a year's worth of services. The preamble language is merely illustrative of two approaches some States may already use to determine the volume of Medicaid services and payments to be included in the yearly limit and was not intend to be all inclusive. Adjudicated claims date would be another acceptable approach to determine the amount of services furnished during the year. However, the approach used must be consistent with the approved State plan language for the specified time period and should be clearly defined in the audit report.

**8. What does the final rule mean by the term Medicaid State plan rate year?**

In using the term State plan rate year, we recognize that while many States may set rates on a State fiscal year basis, some States set rates on a calendar or other annual basis and establish DSH limits accordingly. The State plan rate year is therefore the 12-month period defined by a State's approved State plan in which the State estimates eligible uncompensated care costs and determines corresponding DSH payments as well as other Medicaid payment rates.

**9. Some States utilize certified public expenditures (CPE) to finance the non-Federal share of DSH payments made up to hospital-specific DSH limits. Should States modify existing State plan provisions and/or special terms and conditions (STC) of section 1115 demonstrations in instances where the approved State plan and/or STCs methods for calculating costs for these CPE-funded payments differ from the method for calculating the hospital-specific limit required by the final regulation and associated DSH General Auditing and Reporting Protocol?**

To ensure that claims for DSH expenditures do not exceed hospital-specific DSH limits, States should modify their methods for calculating CPE-funded DSH payments to the extent that the approved State plan and/or STCs methods vary from that required by the final DSH audit regulation and associated DSH General Auditing and Reporting Protocol. If this requires a

5

modification to the State plan or 1115 STCs, State should submit a State plan amendment or section 1115 demonstration amendment, respectively.

The final regulation does include a transition period to ensure that States may adjust uncompensated care estimates prospectively to avoid any immediate adverse fiscal impact and to assist States in ensuring that future DSH payments do not exceed the hospital-specific DSH limit. Additionally, to permit States an opportunity to develop and refine audit procedures, audit findings from Medicaid State plan rate year 2005-2010 will be limited to use for the purpose of estimating prospective hospital-specific uncompensated care cost limits in order to make actual DSH payments in the upcoming Medicaid State plan rate years. CMS is not requiring retroactive collection for Medicaid State plan rate years that have already passed. By using that time to improve State DSH payment methodologies, States may avoid circumstances in which DSH payments that exceed Federal statutory limits must be recouped from hospitals.

## Audit Reports

**10. Please provide clarification on the extent to which the State may rely upon hospitals to perform the DSH audit. Please clarify whether the State may rely upon hospitals' current or expanded financial audits for the certification of the hospital-specific DSH limits.**

As stated in the final rule, the responsibility for certification of an independent audit rests with the State. States must engage an independent auditor to certify that the requirements of the Federal regulation are satisfied, to provide an opinion for each specified verification, and to make a determination as to whether any DSH payments exceeded any hospital's specific DSH limit. States would not meet the independent audit certification requirement by merely expanding audits of hospital financial statements to obtain audit certification from each hospital. However, States may utilize an independent auditor to independently analyze and certify information submitted by each hospital to the State.

Furthermore, the mere fact that a specific auditing entity completes a Medicaid financial audit for a hospital does not necessarily preclude the State from contracting with that auditing entity to complete the independent DSH audit. To the extent that the auditor attests in the DSH audit report that they meet the requirements for auditor independence described in Chapter 3 of the General Accounting Organizations General Audit Standards (GAGAS), an auditing entity of any hospital's financial audit may be eligible to complete the certified DSH audit for the State.

**11. Please provide guidance on what auditing standards and procedures should be used in undertaking the DSH audit as well as what type of report auditors should issue.**

The purpose of the DSH audit is to ensure that Medicaid DSH payments comply with Federal statutory limits. The DSH audit will necessarily rely upon financial and cost report data that are subject to generally accepted accounting principles, and accounting principles specific to hospital accounting under federal grant programs.

Audit procedures that are in accordance with applicable industry standards would meet the criteria established within the final rule if the auditors certify the audit in accordance with the definition of "independent certified audit" as defined at 455.301 of the final rule. We understand that the term "certification" may have specific meaning within the auditing profession. Our use of the term "certification" for purposes of DSH audits is limited to the actions set forth at 455.301. For this purpose, certification means that the auditor attests to qualifying as an independent auditor, has reviewed the criteria of the Federal audit regulation and has completed the verification, calculations, and report under professional rules and generally accepted standards of audit practice. To the extent that the auditor decides that specific methods (which may include requirements beyond the scope of those specifically outlined within the regulation and protocol) are necessary to certify to the audit in accordance with the certification criteria at 455.301 and 455.304, then the auditor should employ these methods. As noted in 455.301, the certification should identify any data issues or other caveats that the auditor identifies as impacting the results of the audit.

We look forward to working with States in refining the auditing process throughout the transition period. Once States and CMS gain greater experience with the auditing process, CMS will work further with States to highlight best practices and auditing methods.

### 12. The 2005 and 2006 DSH audit reports are to be completed by September 30, 2009, and must be submitted to CMS by December 31, 2009. Are States able to grant extensions to auditors to complete the audits subsequent to September 30, if the final report is still delivered to CMS by December 31, 2009?

CMS has determined that it will apply a flexible enforcement strategy designed to ensure that States have sufficient time to properly implement the new requirements without undue hardship. Thus, CMS will not find a State to be out of compliance with the DSH reporting and auditing requirements for the initial (2005 and 2006) Medicaid State plan rate years until December 31, 2010. We do not anticipate any further delay of compliance enforcement, or any delay of compliance enforcement for subsequent audit years.

Even though CMS will be delaying compliance enforcement, CMS expects that States will be making good faith efforts to comply with the new requirements. We asked each State to identify, and to provide in writing to its respective CMS Associate Regional Administrator, a contact individual by September 30, 2009 to brief CMS representatives on the State's compliance status and progress. Based on those discussions, some States were/may be asked for detailed information about compliance efforts.

The final rule included a transition period recognizing that auditing processes and techniques may need to be refined. This transition period lasts through Medicaid State plan rate year 2010, before audit results will be given weight other than in making prospective estimates of hospital costs for the purposes of ongoing DSH payments. In the transition, CMS will work with States that make a good faith effort to fulfill all of the DSH reporting and auditing requirements and that also submit a final report to CMS by the December 31 deadline. It should be noted that States will still be expected to make DSH payments that conform to the hospital-specific limits beginning in 2011.

7

**13. The rule states that the 2005 and 2006 DSH audit reports are to be submitted to CMS by December 31, 2009. What method will CMS use to determine submission date?**

CMS has determined that it will apply a flexible enforcement strategy designed to ensure that States have sufficient time to properly implement the new requirements without undue hardship. CMS will not find a State to be out of compliance with the DSH reporting and auditing requirements for the initial (2005 and 2006) Medicaid State plan rate years until December 31, 2010. We do not anticipate any further delay of compliance enforcement, or any delay of compliance enforcement for subsequent audit years. We asked each State to identify, and to provide in writing to its respective CMS Associate Regional Administrator, a contact individual by September 30, 2009 to brief CMS representatives on the State's compliance status and progress. Based on those discussions, some States were/may be asked for detailed information about compliance efforts.

When States have completed the DSH audits and reports, they should submit the required reports and audits electronically via email to the Associate Regional Administrator of their respective CMS Regional Office on or before the applicable deadline. States are encouraged to carbon copy their Regional Office National Institutional Reimbursement Team (NIRT) representative and CMS Regional Office State representative as well. The receipt date will be the email creation and submission date as indicated on the email.

Certified audits should be submitted in a PDF format using an Adobe Acrobat application and should contain a PDF file of the completed reporting element template. All audit files should be submitted in zip data compression formats to ensure ease of electronic delivery.

CMS is exploring the possibility of including the required reporting elements into the MBES process and will provide additional guidance in the near future. Absent the MBES reporting process, States should submit the report as an excel spreadsheet in addition to the PDF format included in the certified audit report.

**14. Is CMS planning on setting a DSH payment threshold below which some or all of the reporting requirements will be waived?**

There is no statutory authorization for an exception to audit and reporting requirements with respect to hospitals that receive DSH payments. The audit and reporting requirements under section 1923(j) of the Act apply to all States that make DSH payments, with respect to each hospital receiving a DSH payment. As we noted in the preamble to the final rule, the statute requires that each State report to CMS data, and submit a certified audit, that verifies that all hospitals receiving DSH payments under the Medicaid State plan actually qualify to receive such payments and that such payments do not exceed the hospital-specific DSH limit. Even if a State only makes DSH payments under its approved Medicaid State plan that relate to the uncompensated care of providing inpatient and outpatient hospital services to Medicaid individuals (that is, Medicaid shortfall), it would be possible for payments to a hospital to exceed

8

the hospital-specific limit if the hospital had a surplus in furnishing hospital services to the uninsured. While this may be an unlikely circumstance, we cannot at this time be certain that it never occurs. Therefore, in such a circumstance we will accept reporting limited to Medicaid uncompensated care only when the hospital provides a certification that it incurred additional uncompensated care costs serving uninsured individuals. When we review certified audit reports submitted by States, we will consider whether more flexibility would be warranted, and we may address the issue in future reporting instructions. However, prior to receiving the first set of annual State reports, CMS is not contemplating any changes to the reporting requirements.

## Auditor Independence

### 15. What constitutes an independent auditor?

Medicaid regulations at 42 CFR 455.301 define a certified independent audit in part to mean an audit that is conducted by an auditor that operates independently from the Medicaid agency or subject hospital. The intent is for the auditor to be fully able to render objective and impartial judgment on all matters relating to a required DSH audit. Examples of potential conflicts for audit entities would be: calculating a State's DSH payments under the Medicaid State plan; developing State plan DSH payment methodologies for States; preparing uninsured/Medicaid source documents and/or originating data relating to the DSH program on behalf of subject hospitals and/or the State; serving as auditor to any subject hospital or the State agency; and possessing a direct or indirect financial interest in the State's DSH program. In this context, independence generally means that the audit organization and individual auditor is free of any impairment that may in fact or in appearance preclude an impartial opinion or reporting.

States are responsible for ensuring that no possible impairment exists between the auditing organization/auditors and the Medicaid agency and/or hospital. Within the auditing profession, standards have developed to help guide auditors and/or their clients with respect to independence and impairments that might potentially compromise it. The final rule provides that these principles are to be applied to Medicaid DSH audits. The General Accountability Office (GAO), in Chapter 3 of its most recent revision to Government Auditing Standard, identifies specific criteria for independence and outlines impairments to independence in government auditing practices (http://www.gao.gov/govaud/govaudhtml/index.html).

While we believe these generally accepted standards relating to independence in government auditing to be well understood by the auditing profession and would expect their correct application to the required audits, there are some situations that may warrant additional review. For instance, section 3.29 of the General Standards outlines non-audit services that impair auditor independence. The section states certain non-audit services directly support an entity's operations and impair an audit organization's ability to meet overarching audit principles (in this case we would consider the "entity" to be the Medicaid agency and/or hospital). Some examples of these types of services that may impair independence for purposes of conducting the DSH audit include:

*a.* maintaining or preparing the audited entity's basic accounting records or maintaining or taking responsibility for basic financial or other records that the audit organization will audit;

*b.* posting transactions (whether coded or not coded) to the entity's financial records or to other records that subsequently provide input to the entity's financial records;

*c.* determining account balances or determining capitalization criteria;

*d.* designing, developing, installing, or operating the entity's accounting system or other information systems that are material or significant to the subject matter of the audit;

*e.* providing payroll services that (1) are material to the subject matter of the audit or the audit objectives, and/or (2) involve making management decisions;

*f.* providing appraisal or valuation services that exceed the scope described in paragraph 3.28 c;

*g.* recommending a single individual for a specific position that is key to the entity or program under audit, otherwise ranking or influencing management's selection of the candidate, or conducting an executive search or a recruiting program for the audited entity;

*h.* developing an entity's performance measurement system when that system is material or significant to the subject matter of the audit;

*i.* developing an entity's policies, procedures, and internal controls;

*j.* performing management's assessment of internal controls when those controls are significant to the subject matter of the audit;

*k.* providing services that are intended to be used as management's primary basis for making decisions that are significant to the subject matter under audit;

*l.* carrying out internal audit functions, when performed by external auditors; and

*m.* serving as voting members of an entity's management committee or board of directors, making policy decisions that affect future direction and operation of an entity's programs, supervising entity employees, developing programmatic policy, authorizing an entity's transactions, or maintaining custody of an entity's assets.

Further examples of such potential conflicts for audit entities would be: providing audit services for the Medicaid program generally (not specifically related to DSH payments) such as auditing cost reports or determining Medicaid service rates; serving as auditor to any subject hospital or the State agency; and possessing a direct or indirect financial interest in the State's Medicaid program.

There are situations in which sufficient firewalls exist between such services that would serve to eliminate the potential conflict regarding auditor independence. In such cases, States must explain why such an audit firm meets the GAGAS independence standards despite the appearance that the auditing entity is not independent. The audit firm must also declare its independence in the audit and report submitted to CMS. States should look to the General Auditing Standards in their entirety to ensure that no possible impairments to independence exist.

For State plan rate year 2007 and thereafter, auditing organizations/auditors must submit a signed statement declaring independence of the respective Medicaid agency and hospitals. This statement should be included with the audit and report submitted to CMS on an annual basis.

10

**16. Can States use provider-related donations, assessments, taxes on, or other similar funding arrangements with DSH hospitals to fund the required audits?**

The DSH audit requirements and final rule do not supersede any Medicaid provisions relating to donations and taxes. As a practical matter, we do not see how a State could rely on "voluntary" donations to fund required Medicaid programs and expenses. As indicated in the preamble, section 1923(j) makes these DSH audit and reports a Medicaid program requirement and as such States are responsible for funding the costs to fulfill them just as they are any other Medicaid administrative costs. To the extent a State's payment methodology for the audits and reports would be prohibited as an impermissible tax or donation, a State may not employ that methodology for purposes of funding the audits. States may not impose DSH fees or require financial participation in the funding of the audit as a condition for receiving DSH payments. Furthermore, to the extent that a provider-related donation presumed to be bona fide contains a hold harmless provision, it would not be considered a bona fide donation.

## Revenue Recognition

**17. How should States, hospitals, and auditors treat Medicaid payments received after the completion of the audit for a particular Medicaid State plan rate year?**

In recognition of potential delays in obtaining needed information, we have extended the period for ongoing report and audit submission until the end of the Federal fiscal year that is at least three years after the close of the Medicaid State plan rate year. We believe that hospitals would have received most Medicaid, DSH payments, and other payments associated with that Medicaid State plan rate year.

Based on the modifications to the audit and reporting deadlines, the existing requirement at 42 CFR 447.45(d) for provider claims to be filed within a year from the date of service and promptly paid by the State, and the existing two-year timely claim filing requirement at 45 CFR 95.7, there should not be a significant adjustment to Medicaid payments that would warrant a corrected audit and report. To the extent that a significant adjustment to Medicaid payments occurs and States claim Federal matching dollars (or return Federal matching dollars) as a prior period adjustment, States should correct the audit and report by indicating post-audit adjustments to Medicaid and DSH payments (or uncompensated care costs if Medicaid payment adjustments affect the Medicaid shortfall). When post-audit retroactive adjustments to Medicaid payments are not significant, the payments should be measured during the audit of the Medicaid State plan rate year in which the revenues are received.

**18. The final regulation and the preamble address which State plan rate year revenues apply to for purposes of calculating a hospital-specific DSH limits. It appears, however, that the preamble requires Medicaid payment offsets occurring after the completion of the DSH audit be applied duplicately in calculating hospital-specific DSH limits for two distinct State plan rate years. Can you confirm that these Medicaid revenues should be applied in calculating hospital-specific DSH limits for only one Medicaid State plan rate year?**

11

Medicaid revenues identified in the post-audit period must only be applied against one State plan rate year for purposes of calculating hospital-specific DSH limits.

### 19. Against which Medicaid State plan rate year are revenues received by a hospital by or on behalf of either 'self-pay' or uninsured individuals during the Medicaid State plan rate year under audit offset?

The General DSH Audit and Reporting Protocol provides clarification regarding all payments received during cost reporting period(s) covering the Medicaid State plan rate year under audit by or on behalf of patients with no source of third party coverage. There will be no attempt to allocate payments received during the State plan rate year to services provided in prior periods. Since the goal of the audit is to determine uncompensated DSH costs in a given Medicaid State plan rate year, all payments received in the year will be counted as revenue to the hospital in that same year. It is understood that some costs incurred during the State Plan rate year under audit may be associated with future revenue streams (legal decisions, payment plans, and recoveries) but that the payments are not counted as revenue until actually received.

## Allowable Costs/Medical Necessity

### 20. Will CMS be issuing guidance on what constitutes medically necessary services?

CMS does not intend to issue guidance on what constitutes medically necessary services. CMS will continue to allow States flexibility in determining medical necessity under their individual Medicaid programs within the guidelines of the Social Security Act provided at 1902(a)(30) and 1902(a)(19), and the implementing regulations at 42 CFR 440.230(d), which state "The [Medicaid] agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." Generally, services that are considered reimbursable under the Medicaid State plan would also be considered as necessary services when calculating a hospital's eligible uncompensated care cost.

### 21. Are States required to follow only Medicare reasonable cost principles, or will they be allowed to establish allowable cost rules that may differ from Medicare?

As noted in the preamble to the final rule, section 1923(g)(1) of the Act provides for a Federal limitation based on costs that must be calculated in accordance with Federal accounting standards. The same methods used in preparing the Medicare 2552-96 cost report should be applied in determining costs to be used in calculating the hospital-specific DSH limits.

Hospitals' Medicare cost reports, audited financial statements, and accounting records should contain the information necessary for reporting and auditing responsibilities, in combination with information provided by the States' Medicaid Management Information Systems (MMIS) and the

12

approved Medicaid State plan governing the Medicaid payments made during the audit period. The CMS developed General DSH Audit and Reporting Protocol will assist States and auditors in using information from each of these sources to determine allowable uncompensated care costs consistent with the statutory requirements. The protocol is available on the CMS Web site at: www.cms.hhs.gov/MedicaidGenInfo/Downloads/CMS2198FRptProtocol.pdf.

**22. If a State allows for graduate medical education as an allowable component of cost and is included in the Medicaid State Plan, should the State require the filing of Medicaid cost reports that incorporate the graduation medical education in the determination of program cost?**

All costs that are associated with services that are defined and reimbursed under the approved Medicaid State plan as inpatient hospital services and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage may be included in calculating the hospital-specific DSH limit. To properly capture these costs in the hospital-specific DSH limit, State's should include these costs as part of the Medicare 2552-96 cost report step-down process and utilize the General DSH Audit and Reporting Protocol.

To the extent that a State allows graduate medical education (GME) as a component of cost and it is reimbursed under the Medicaid State plan, the State can include these costs in determining hospital-specific DSH limits. Please be reminded that the State still must use the cost reporting and apportionment process as prescribed by the Medicare 2552-96 identified in the General DSH Audit and Reporting Protocol.

**23. "How should States treat unpaid Medicaid days or charges for purposes of calculating hospital-specific DSH limits?" What if the unpaid days are a result of untimely filing or a hospitals failure to seek prior authorization?**

The hospital-specific DSH limit includes the costs incurred during the year of furnishing hospital services
to Medicaid beneficiaries and the uninsured, net of Medicaid payments and payments made by or on behalf of the uninsured. To be included as Medicaid cost in the limit, a hospital service must be included in a State's definition of an inpatient hospital service or outpatient hospital service under the approved State plan and furnished to Medicaid eligible individuals.

Individuals with Medicaid or other third party coverage are not considered as uninsured under 1923(g)(1). Improper billing by a provider does not change the status of an individual as insured or otherwise covered. In no instance should costs associated with claims denied by a health insurance carrier for such a reason be included in the calculation of hospital-specific uncompensated care costs.

**24. A Medicaid program in a State covers speech therapy services for beneficiaries under 18 years of age. A hospital in that State provided speech therapy to a Medicaid enrollee who was over 18 and claimed the services as uninsured care. Are**

the costs incurred by the hospital in providing the speech therapy service allowed to be included in the calculation of hospital-specific DSH limits?

In this example the costs associated with speech therapy services can be included in the calculation of hospital-specific DSH limits to the extent that such services are treated as "hospital services" under the State plan because the patient is eligible for Medicaid. The hospital-specific limit is based on the costs incurred for furnishing "hospital services" and does not include costs incurred for services that are outside either the State or Federal definition of inpatient or outpatient hospital services. While States have some flexibility to define the scope of "hospital services," States must use consistent definitions of "hospital services." Hospitals may engage in any number of activities, or may furnish practitioner or other services to patients, that are not within the scope of "hospital services," including speech therapy. A State cannot include in calculating the hospital-specific DSH limit cost of services that are not defined under its Medicaid State plan as a Medicaid inpatient or outpatient hospital service.

## Determination of Uninsured Status

25. **CMS seems to contradict itself in replying to the question of including patients who lack coverage for the service provided but not necessarily any coverage at all. CMS states that they have never read the statute to be service-specific and believe that such an interpretation would be inconsistent with the broad statutory references to insurance or other coverage. Furthermore, CMS replies that such a reading would result in cost shifting from private sector coverage to the Medicaid program. However, in a January 10, 1995 letter to Donna Checkett, Chair of the State Medicaid Director's Association, CMS clarified that: "it would be permissible for States to include in their determination of uninsured patients those individuals who do not possess health insurance which would apply to the service which the individual sought". Is it CMS's position now that it depends on whether the individual has creditable coverage consistent with 45 CFR 144 and 146 and not whether the specific service is covered?**

Section 1923(g)(1) of the Act refers to the costs of hospital services furnished by the hospital to individuals who have no health insurance (or other source of third party coverage). This language is not service-specific and any interpretation to the contrary would be inconsistent with the broad statutory references to insurance or other coverage. In an effort to adhere to a more accurate representation of the broad statutory references to insurance or other coverage; and to delineate more definitively the meaning of the term uninsured, CMS clarified the populations for which hospitals may calculate uncompensated care costs. We interpret the phrase "who have health insurance (or other third party coverage)" to broadly refer to individuals who have creditable coverage consistent with the definitions under 45 CFR Parts 144 and 146, as well as individuals who have coverage based upon a legally liable third party payer. Creditable coverage would include coverage of an individual under a group health plan, Medicare, Medicaid, a medical care program of the IHS or tribal organization, and other examples as outlined in the rules relating to creditable coverage at 45 CFR 146.113.

14

26. Does an advance beneficiary notice for a medically necessary procedure satisfy the requirement that "[c]laims denied by a health insurance carrier, including a Medicaid contracted managed care organization, for any reason other than the inpatient/outpatient service or services provided were not covered services within the individuals health benefit package are furnished to individuals who have health insurance coverage"?

The quoted sentence is taken out of context and does not reflect a "requirement." The underlying requirement is that, to be included in the calculation of the hospital-specific limit, the services at issue must be furnished to an individual who does not have "health insurance (or other source of third party coverage)." As indicated in the sentence prior to the quoted sentence. "[t]he costs of services for individuals who have health insurance are not included in calculating the hospital-specific limit, even if insurance claims for that particular service are denied for any reason." And the following sentence states that services are considered to have been provided for an individual with health insurance or third party coverage even though a claim has been "denied due to improper billing, lack of preauthorization, lack of medical necessity, or non-coverage under the third party insurance package." While the quoted sentence may have been inartfully drafted, the overall meaning is clear. The quoted sentence does not indicate that costs related to denials for non-coverage automatically qualify for inclusion in the hospital-specific limit; it simply indicates that certain denied claims cannot be included in the cost limit. When a claim is denied as non-covered, the hospital may then wish to verify that the individual was actually insured, and that the insurance was creditable coverage. Both the statute and the rule clearly indicate that costs of services for individuals who have health insurance (or other source of third party coverage) are not included in calculating the hospital-specific limit, even if insurance claims for that particular service are denied for any reason.

27. The preamble states, "To the extent the Medicaid payment does not fully cover the cost of the inpatient or outpatient hospital services provided, the unreimbursed costs of those services would be counted in calculating that limit." Some hospitals have interpreted this language to mean that any services provided to Medicaid beneficiaries but not reimbursed by Medicaid should be treated as uninsured. Is this interpretation correct?

The interpretation referenced in the question does not accurately reflect the provisions at section 1923(g)(1) of the statute which expressly refers to uncompensated costs of furnishing hospital services to individuals eligible for Medicaid or individuals who have no health insurance or other third party coverage. If an individual is Medicaid eligible on the day they received medically necessary inpatient or outpatient hospital services, then those services (to the extent that they are allowable under the State's plan) would be included in calculating the Medicaid portion of the hospital-specific limit.

28. How should States count costs not otherwise covered for individuals in an IMD (as Medicaid shortfall, uncompensated care costs, or not included) for those individuals

15

**with Medicaid ages 22-64 while in an IMD if the individual is also a dual eligible (Medicare)?**

For the costs of services provided to those patients between the ages of 22 and 64 who are otherwise eligible for Medicaid, the treatment of the service costs in the hospital-specific limit may vary based on State practice. Many States remove these individuals from eligibility rolls for administrative convenience (and must reinstate them if they are discharged from the IMD); if so, the costs should be reported as uncompensated care for the uninsured. States that do not remove the individuals from the Medicaid eligibility rolls should report the costs as uncompensated care for the Medicaid population. Therefore, the costs of services provided in an IMD to an individual who is 22-64 and who is otherwise Medicaid eligible, can be included either as uninsured uncompensated or Medicaid uncompensated in the UCC, depending on the eligibility status (as determined by the state) of the individual while in the IMD.

For dual eligible patients ages 22-64 old in an IMD, the treatment of costs would be determined by the State Medicaid eligibility policies. In States that do not remove the individual from Medicaid eligibility, these dual eligibles are Medicaid eligible and their uncompensated costs should be included as Medicaid uncompensated costs. In States that remove such individuals from Medicaid eligibility rolls while in an IMD, these individuals would be Medicare only during the IMD stay and therefore considered to have third party coverage (Medicare). Uncompensated care costs would therefore not be allowed in the uninsured uncompensated cost portion.

## Hospital Data

**29. Because hospitals may not have detailed cost center-specific charge information for uninsured and Medicaid MCO patients for prior years, would it be acceptable to allocate total uninsured or Medicaid MCO charges to specific ancillary cost centers based on the percent to total of Medicaid charges, or, should uninsured or Medicaid MCO costs be disallowed entirely for these hospitals?**

We expect that State reports and audits will be based on the best available information in conjunction with guidance from their independent auditors. If audited Medicare cost reports are not available for each hospital, the DSH report and audit may need to be based on Medicare cost reports as filed. We note that hospitals must follow the cost reporting and apportionment process as prescribed by the Medicare 2552-96 cost report process. To the extent that these cost reports do not contain the precise information needed for the DSH calculation, it may be necessary for hospitals to modify their accounting techniques. In those circumstances, for the initial audits, it will be necessary to use other source materials such as audited hospital financial records and other records, and to develop methodologies to determine the necessary information from such records. We expect States, independent auditors and hospitals to work cooperatively to develop such methodologies.

CMS has developed a General DSH Audit and Reporting Protocol which will be available on the CMS Web site that should assist States and auditors in utilizing information from each source

identified above and developing methods to determine uncompensated costs of furnishing hospital services to the Medicaid and uninsured populations. The protocol is available on the CMS Web site at: www.cms.hhs.gov/MedicaidGenInfo/Downloads/CMS2198FRptProtocol.pdf.

**30. The regulation requires use of a Medicare hospital cost report to provide data to States and CMS. Some children's hospitals do not care for a large number of Medicare patients and may not file Medicare cost reports or may provide low utilization reports. Is there an alternative reporting tool that children's hospitals could use and still be in compliance with the regulation provisions?**

We anticipate that States and auditors will use the best available and most accurate data. The DSH reports and audit will rely on existing financial and cost reporting tools including the Medicare 2552–96 cost report as well as audited hospital financial statements and accounting records in combination with information provided by the States' Medicaid Management Information Systems (MMIS) and the approved Medicaid State plan governing the Medicaid payments made during the audit period. If a hospital (e.g. a children's hospital) does not file or files only a partial Medicare 2552-96 cost report, the State remains responsible for reporting the information which would have otherwise been available on the Medicare 2552-96 from each hospital for Medicaid and uninsured purposes. In order to fulfill the requirements of this section, States may require such hospitals to provide the same data to the State as if they were filing the Medicare 2552-96.

**31. When you say "costs of services" or "costs for dual eligibles" do you mean that this term is interchangeable with charges or do you mean just costs?**

A. In the regulation, the term "costs" is not interchangeable with the term "charges."

**32. As part of the reporting requirements, is the State required to submit a LIUR calculation for every hospital that received a DSH payment or only for the hospitals which are deemed eligible for disproportionate share based on their LIUR?**

Under section 1923(b), hospitals may be deemed as disproportionate share hospitals based on either their MIUR or LIUR. We recognize that some hospitals may be so deemed based on both their MIUR and their LIUR. In order to fulfill the requirements of the final rule, States should submit the appropriate calculation for both the LIUR and the MIUR for these hospitals. We believe this is beneficial to both the State and to hospitals. The report must show that each hospital receiving DSH payments meets applicable DSH eligibility requirements. Should a hospital thought to be qualified under the LIUR but is later found not to be, a determination can readily be made about its potential DSH eligibility under the other formula.

## Dual Eligibility

17

**33. Would days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage (such as Blue Cross) also be included in the calculation of the MIUR percentage and the DSH limit in the same way States include days, costs and revenues associated with individuals dually eligible for Medicaid and Medicare?**

Days, cost, and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid inpatient utilization rate (MIUR) for the purposes of determining a hospital eligible to receive DSH payments. Section 1923(g)(1) does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance. Therefore, days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit. As Medicaid should be the payer of last resort, hospitals should also offset both Medicaid and third-party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.

**34. The regulation states that costs for dual eligibles should be included in uncompensated care costs. Could you please explain further? Under what circumstances should we include Medicare payments?**

Section 1923(g) of the Act defines hospital-specific limits on FFP for Medicaid DSH payments. Under the hospital-specific limits, a hospital's DSH payment must not exceed the costs incurred by that hospital in furnishing services during the year to Medicaid and uninsured patients less payments received for those patients. There is no exclusion in section 1923(g)(1) for costs for, and payment made, on behalf of individuals dually eligible for Medicare and Medicaid. Hospitals that include dually-eligible days to determine DSH qualification must also include the costs attributable to dual eligibles when calculating the uncompensated costs of serving Medicaid eligible individuals. Hospitals must also take into account payment made on behalf of the individual, including all Medicare and Medicaid payments made on behalf of dual eligibles. In calculating the Medicare payment for service, the hospital would have to include the Medicare DSH adjustment and any other Medicare payments (including, but not limited to Medicare IME and GME) with respect to that service. This would include payments for Medicare allowable bad debt attributable to dual eligibles.

**35. Is it CMS' intention that dual eligibles would include individuals with Medicare for whom Medicaid pays only Medicare deductibles, coinsurance, or Medicare Part A or B premiums?**

For the purposes of the DSH audits and reporting requirements, dual eligibles include all individuals with Medicare who also are eligible for some form of Medicaid benefit. This includes those individuals for whom Medicaid pays only Medicare deductibles, coinsurance, or Medicare Part A or B premiums.

18

**36. Medicare DSH allows hospitals to claim additional Medicaid days beyond the paid days for patients with commercial insurance through their employer and Medicaid. Would these patients be included in Medicaid DSH since they are Medicaid eligible?**

The Medicare DSH program and the Medicaid DSH program are separate programs authorized by different sections of the statute and with different purposes and goals. If the patients are Medicaid eligible, then costs and revenues associated with inpatient and/or outpatient services furnished to them must be included in the hospital-specific limit calculation. Revenues required to be offset against a hospital's DSH limit would include any amounts received by the hospital by or on behalf of the Medicaid eligible individuals (for any days those individuals remain Medicaid eligible) during the Medicaid State plan rate year under audit (except payments from State or local programs based on indigency).

## ARRA

**37. How is the DSH audit and reporting rule affected by section 5002 of the American Recovery and Reinvestment Act of 2009 (ARRA)?**

DSH payment adjustments made using the ARRA increased state allotments are subject to DSH audit and reporting requirements. ARRA provided additional potential fiscal relief to States by increasing most States' Federal fiscal year (FFY) 2009 and 2010 Medicaid DSH allotments by 2.5 percent. Specifically, section 5002 of ARRA amended section 1923(f)(3) of the Act to provide a temporary increase in state DSH allotments for these fiscal years. Section 5002 of ARRA did not otherwise modify DSH requirements. States are required to follow the same requirements for payment adjustments made under the increased allotment as they would for any other DSH payment adjustments, including DSH reporting and auditing requirements.

# Additional Information of the DSH Reporting and Audit Requirements – Part 2

## Independent Certified Audit Engagement Type

### 1. What type of engagement are auditors required to utilize in conducting the annual DSH audit to ensure that the state and auditor meet all federal requirements?

The final rule affords flexibility to states and auditors regarding the independent certified audit engagement type and does not specifying the type of audit engagement to be employed. To ensure that states and auditors meet all appropriate federal requirements, we are reiterating the 2008 final DSH rule requirements regarding the engagement type and providing clarifying guidance regarding how the audits must be conducted.

42 CFR 455.301 defines an independent certified audit as an audit that is conducted by an auditor that operates independently from the Medicaid agency or subject hospitals and is eligible to perform the DSH audit. Certification means that the independent auditor engaged by the state reviews the criteria of the federal audit regulation and completes the verification, calculations and report under the professional rules and generally accepted standards of audit practice. This certification would include a review of the State's audit protocol to ensure that the federal regulation is satisfied, an opinion for each verification detailed in the regulation, and a determination of whether or not the state made DSH payments that exceeded any hospital's specific DSH limit in the Medicaid SPRY under audit.

While Medicaid statute and federal regulations do not specify the type of engagement required for purposes of the independent certified DSH audit, regulations do require that the independent auditor review applicable federal audit requirements and complete the engagement under the professional rules and generally accepted standards of audit practice. To ensure that federal requirements are met:

- Each audit report must identify the scope and coverage of the audit.
- As part of the independent certified audit, auditors must review the data elements spreadsheet submitted by the state as part of the audit and conduct data testing for each element at 42 CFR 447.299 as part of certifying to the verifications at 42 CFR 455.301. Auditors are expected to test data on all hospitals or a valid sample.
- As part of the independent certified audit, auditors must conduct testing related to all verifications at 42 CFR 455.301.
- For audits in which auditors do not conduct onsite reviews of all hospitals in the state, the auditor must use a combination of onsite, detailed desk reviews, and desk

reviews determined under the professional rules and generally accepted standards of audit practice, such as using a risk assessment. For this process, the state must not participate in or influence which hospital reviews are onsite and which are desk reviews to avoid impairing auditor independence.

## Audit Verifications

2. Are states required to include in the annual DSH audit submission a state-specific definition of "inpatient hospital and outpatient hospital costs for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and individuals with no source of third party coverage for the inpatient hospital and outpatient hospital services they received?"

Yes, 42 CFR 455.304(d)(6) requires that states specify in their annual audit submission how they define "incurred inpatient hospital and outpatient hospital costs for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and individuals with no source of third party coverage for the inpatient hospital and outpatient hospital services they received." Additionally, states should ensure that this definition aligns with any definition of the hospital-specific DSH limit in their state plan.

## Audit Reporting Requirements - Data Elements Report

3. When are states required to begin reporting the three new data elements established by the final Medicaid DSH allotment reduction rule published on September 18, 2013?

States should begin reporting the three new data elements for the first state plan rate year audits due to states following the effective date of the final rule. State plan rate year (SPRY) 2010 audits were due to states on September 30, 2013 and the rule establishing the three additional reporting requirements is effective on November 18, 2013. Therefore, states should include the new reporting elements with their DSH audit and report for SPRY 2011, which is due to states on September 30, 2014 and to CMS on December 31, 2014.

4. Are states required to complete each of the cells for every hospital on the Data Elements spreadsheet?

Yes, states are required to complete each cell of the data element report that accompanies the DSH audit unless otherwise specified in regulation (e.g. – states are only required to report certain columns for out-of-state hospitals).

States must populate all payment, revenue, cost, and payment limit cells with a numeric value. The relevant cells are as follows:

42 CFR 447.299(c)(2, 6-17, 20)

If the state did not make a payment or if a hospital did not incur cost relating to these data elements, the state must enter a value of zero (0). Values of N/A, blank, or any other non-numeric values in these fields will be treated as missing data elements.

States must also enter information for all the following qualifying criteria data elements:

42 CFR 447.299(c)(3-5)

States must enter numeric values for (c)(3) and (c)(4) unless federal requirements do not require the state to report either of these statistics. In such cases, the state should include "N/A" instead of a numeric value for this field. If a state uses an alternate broader DSH qualification methodology as authorized statute and implementing regulations, the state must enter the value of that statistic and specify the methodology used to determine that statistic, as required by 42 CFR 447.299(c)(5). If the state uses this field, the state must include a footnote on the data element spreadsheet specifying the methodology used to determine that statistic.

Any data element reports with missing information will be treated as incomplete. In accordance with 42 CFR 447.299(e), CMS will reduce state expenditures by the amount of FFP attributable to DSH payments made to hospitals with missing information until such time as the information is reported.

5. **How will CMS treat missing information from data elements after the transition period?**

Any data element reports with missing information will be treated as incomplete. In accordance with 42 CFR 447.299(e), CMS will reduce state expenditures by the amount of FFP attributable to DSH payments made to hospitals with missing information until such time as the information is reported.

6. **Are states required to identify Institutions for Mental Disease (IMDs) and out-of-state hospitals on the data elements report?**

Yes, 42 CFR 447.299(c)(1) requires that states identify IMDs and out-of-state hospitals on its data elements report. The separate identification of IMDs (including other mental health facilities as identified in section 1923(h) of the Social Security Act) is necessary to ensure the appropriateness of the DSH payments and compliance with the DSH payment limit for IMDs and other mental health facilities established at 1923(h) of the Social Security Act (Act). Separate identification of out-of-state hospitals is required to avoid duplicative audit work, to allow auditors and CMS to track hospitals that receive DSH payments from multiple states.

States must also include a note on the data elements report if they do make DSH payments to IMDs or if they do not make DSH payments to out-of-state hospitals.

## Late Audits and Reports

### 7. How will CMS treat incomplete audits and reports after the transition period?

CMS treatment of late audits and reports will not change after the regulatory transition period. According to statute and implementing regulation, states' Medicaid DSH expenditures are conditioned upon timely receipt of the audit and report. Therefore, should a state not submit the DSH audit and report that comport with federal requirements by December 31st of each year, CMS will begin deferring FFP for all DSH expenditures claimed on the Quarterly Medicaid Statement of Expenditures for the Medicaid Assistance Program (Form CMS-64) for all subsequent quarters. Only after a state has submitted an acceptable audit and report will deferred claims for DSH payments be released.

## Out-of-State Eligibles

### 8. Are states required to include costs and revenues associated with out of-state Medicaid eligible individuals in the calculation of hospital-specific DSH limit?

As stated in the preamble to the final rule (page 77946), states are required to include all eligible costs and revenues associated with out of state eligibles in the calculation of the hospital-specific DSH limit. Any Medicaid payments received by a hospital from any Medicaid agency (in-state or out-of-state) must be counted as revenue offsets against total incurred Medicaid costs. Any DSH payments received by a hospital from any Medicaid agency (in state or out of state) must be counted as an offset against uncompensated care for purposes of the DSH audit and ensuring that the hospital-specific DSH limit is not exceeded. States should modify audit protocols as necessary to provide guidance to hospitals regarding the inclusion of such costs. Additionally, states should develop and implement policies, procedures, and internal controls to ensure that hospitals include all out of state Medicaid eligible hospital days, charges and payments for reporting DSH costs.

## Section 1011 Payments

### 9. What will states be required to report related to Section 1011 payments now that many states have exhausted these funds?

The regulation requires that states include section 1011 revenue received by hospitals when calculating hospital-specific DSH limits and when completing the DSH data elements report. CMS recognizes that many states have exhausted their available Section 1011 funds and are now in 'spent-down' status. The state should report "$0" for each hospital that does not receive section 1011 payments. To the extent that hospitals still receive section 1011 payments, states must continue to report such payments on the data elements report.

## State-Only/Local Government-Only Indigent Care Programs

**10. Should states include costs and payments associated with individuals covered under a state-only or local government-only indigent care program when calculating the hospital-specific DSH limit?**

States should include costs associated with individuals covered under state-only or local government-only indigent care program to determine uninsured uncompensated care cost when calculating the hospital-specific DSH limit, unless the individuals has an additional source of third party coverage or health insurance.

Section 1923(g) of the Act specifies that any payment made by states or local units of government directly to DSH hospitals under such programs is not considered a source of third party payment. Therefore, such payments made by a state or unit of government directly to a DSH hospital should not be offset against the inpatient and outpatient hospital service costs for the individuals receiving services through these programs.

## Managed Care/State-Only Indigent Care Programs

**11. Do costs and revenues associated with inpatient and outpatient hospitals services delivered through managed care organizations to Medicaid eligible individuals and uninsured individuals need to be included in the calculation of the hospital-specific DSH limit?**

Yes. Section 1923(g)(1)(a) of the Act and implementing regulations require that hospitals include costs associated with inpatient and outpatient hospital services provided to Medicaid managed care enrollees net of the inpatient and outpatient hospital payments made to the hospital from Medicaid MCOs when calculating the hospital-specific DSH limit.

**12. How should states treat costs associated with individuals enrolled in a state-only/local government-only indigent care program under which services are delivered through a private managed care organization (MCO)?**

Unless the individual has an additional source of third party coverage, states should treat any individual enrolled in a state-only/local government-only indigent care program under services are delivered through a private managed care organization as uninsured for purposes of calculating the hospital-specific DSH limit. Accordingly, all inpatient hospital and outpatient hospital service costs associated with these individuals must be included in the calculation of the hospital-specific DSH limit.

When calculating the hospital-specific DSH limit, any revenues received by hospitals from the managed care organization for inpatient and outpatient services for individuals, whether enrolled in a state-only/local government-only indigent care program or not, must be offset against costs. The statutory exception applies only for payments received directly from a state or unit of government for a specific service. Managed care payments to DSH hospitals, including those relating to individuals enrolled in a state-only/local government-only indigent care program, must be offset against costs when calculating the DSH limit.

If the state carves out hospital services from the managed care contracts and the MCO has a separate contract to make payments as a fiscal agent for the state or local unit of government, CMS will consider the payments as being received directly from a state or local unit of government. The state is not required to offset such payments when calculating the hospital-specific DSH limit.

### 13. If there are state-only indigent health programs that receive federal matching through a Medicaid section 1115 demonstration, should the payments received by the hospitals under those programs be offset?

Yes, since those indigent programs are no longer funded only by state or local government money, the payments received by the hospitals under those programs no longer meet the exception under section 1923(g)(1)(A) of the Act and therefore are subject to offset against the costs of the uninsured services.

## Physician Services

### 14. Can the state include physician service costs in calculating the hospital-specific DSH limit?

No. For Medicaid eligible or uninsured individuals, only costs incurred in providing inpatient hospital and outpatient hospital services identified in section 1905 of the Act and covered under the approved Medicaid State plan as inpatient hospital or outpatient hospital services should be included when calculating the hospital-specific DSH limit. Any services that fall outside of either definition are not eligible for inclusion in the calculation of the hospital-specific limit.

Under the Medicaid statute, section 1905(a) of the Act identifies categories of medical items and services eligible for federal matching payment under the Medicaid program. Inpatient hospital services, outpatient hospital services, and physician services are listed as separate and distinct categories of Medical assistance. Inpatient hospital services are defined in section 1905(a)(1) and implementing regulations at 42 CFR 440.10, outpatient hospital services are defined at section 1905(a)(2)(A) and implementing regulations at 42 CFR 440.20(a), and physician services are defined at section 1905(a)(5)(A) and implementing regulation at 42 CFR 440.50(a).  The DSH limit provided in section 1923(g) of the Act, refers only to hospital services and does not include physician services or any other Medicaid services listed in section 1905(a) of the Act.

We recognize that some states include certain service activities associated with physicians in their definition of inpatient hospital or outpatient hospital services.  To the extent that such service activities are within the federal definition and approved state plan definition of inpatient hospital or outpatient hospital services and are billed and paid as inpatient hospital or outpatient hospitals services, states should include such incurred costs and associated revenues in calculating the hospital-specific DSH limit.  Services that are billed and paid as professional services, even if they are processed by or through a hospital's billing department, cannot be included in the calculation of the hospital-specific DSH limit.

State must use consistent definitions of inpatient and outpatient hospital services for purposes of Medicaid coverage, Medicaid reimbursement, the Medicaid DSH program, and health care-related taxes.

## Data Sources

### 15. Is it permissible for a state to rely on a hospital's own data instead of MMIS data for determining paid Medicaid days and charges?

No.  The General DSH Audit and Reporting Protocol indicates that it is the DSH hospital's responsibility to utilize MMIS data obtained from the state for Medicaid FFS IP/OP hospital ancillary charges and Medicaid FFS IP hospital routine days.

### 16. Are there ways for states to determine uninsured costs without relying on audited hospital records to obtain uninsured hospital charges, such as using charity care or bad debt to estimate uninsured cost?

No, states must follow the regulatory requirements and the General DSH Reporting and Auditing Protocol by utilizing the Medicare 2552 cost report and audited hospital financial statements (and other auditable hospital accounting records) to determine uninsured cost. States and hospitals cannot substitute charity care and/or bad debt data as a proxy for

uninsured cost as defined in federal regulations. The definitions of charity care and bad debt may vary significantly from the federal definition of uninsured costs.

# Calculation of Uncompensated Care Cost

### 17. Are states required to use the Medicare 2552 cost report as the basis for calculating hospital-specific DSH limits or can the state rely on state-only hospital cost reports?

42 CFR 455.304(c)(3) and CMS policy guidance requires that states use the Medicare 2552, in conjunction with audited hospital financial statements and accounting records, information provided by the states' Medicaid Management Information Systems (MMIS), and the approved Medicaid State plan governing the Medicaid payments made during the audit period to the hospital-specific DSH limit.

States cannot substitute an alternate cost report for the Medicare 2552 when calculating uncompensated care costs unless a hospital (e.g. a children's hospital) does not file or files only a partial Medicare 2552 cost report. In such circumstances, the state remains responsible for reporting the information which would have otherwise been available on the Medicare 2552-96 from each hospital for Medicaid and uninsured purposes. To fulfill the federal DSH audit and reporting requirements, states may require such hospitals to provide the same data to the State as if they were filing the Medicare 2552. State audit and reports that impermissibly rely on alternate cost reports will be determined incomplete.

### 18. Where can states, hospitals, and auditors find information regarding the requirements for using Medicare cost report data for calculating allowable hospital costs?

States, hospitals, and auditors should rely on the federal regulations at 42 CFR 447.299, the DSH audit and reporting final rule published on December 13, 2008, the General DSH Audit and Reporting Protocol, the Additional Information on DSH Reporting and Auditing, and this document. CMS is available to provide technical assistance regarding the requirements upon request.

### 19. What is the proper way to treat observation bed days in the calculation of uncompensated care costs?

States and hospitals must include observation bed days when computing total bed days. If these days are omitted, total days used to calculate routine cost center per diems would be understated. This would result in routine cost center per diems being overstated and, in turn, cause an overstated hospital-specific DSH limit. States should p correct instructions/references

to hospitals to obtain and report accurate routine total day counts, including observation bed days, for purposes of calculating the hospital-specific DSH limit.

### 20. Should "allowed days" or "billed days" be used when calculating hospital Medicaid routine costs?

Item #23 of the Additional Information on the DSH Reporting and Audit Requirements clarified how unpaid Medicaid days and charges should be treated. Specifically, the guidance stated that the cost of furnishing services to any individual who is eligible for Medicaid is included in a hospital's uncompensated care cost, as long as the services are inpatient and outpatient hospital services under the approved Medicaid state plan.

States should ensure that the determination of a hospital's uncompensated care cost properly includes Medicaid days and charges related to state plan inpatient and outpatient hospital services furnished to Medicaid-eligible individuals, regardless of whether or not those days and charges are actually paid by the State. Some states have limits on the number of days reimbursed annually for hospital services. Only including the reimbursed days (allowed days), understates Medicaid costs reported for the hospital, potentially understating the hospital-specific DSH limit. States and hospitals must use covered days for purposes of calculating the hospital-specific DSH limit.

## Cost Report Proration

21. When instances arise in which the hospital fiscal year end (and related Medicare 2552 cost report) do not coincide with the Medicaid state plan rate year, and the hospitals need to develop per diem rates and cost-to-charge ratios for state year that use two cost report periods, can such per diem rates and cost-to-charge ratios be averaged from the applicable cost reports? For example, if the hospital year end is June 30, 2011 and the state reporting period is September 30, 2011, can the hospitals use an average per diem rate and cost-to-charge ratio that is based on a calculation that involves 9/12ths of the rates and ratios for the period ended June 30, 2011 and 3/12ths of the rates and ratios for the period ended June 30, 2012? Or, are the hospitals required to generate more precise measurements of the per diem rates and cost-to-charge ratios for the state's reporting period ended September 30, 2011?

In instances where the hospital financial and cost reporting periods differ from the Medicaid state plan rate year, states and auditors may need to evaluate multiple audited hospital financial reports and cost reports to fully cover the Medicaid state plan rate year under audit. Typically, at most, two financial and/or cost reports should provide the appropriate data. (Please note that there are some circumstances where more than two cost reports are needed to cover a state plan year. Some occasions call for a hospital to file short-period cost reports

within a normal 12-month cost reporting period. For example, if there is a change of ownership in the middle of a fiscal period, the hospital may file more than one cost report during its 12-month fiscal period.) The data will need to be allocated based on the months covered by the financial or cost reporting period that are included in the Medicaid state plan period under audit. CMS has developed a General DSH Audit and Reporting Protocol to assist states in using the information from each source identified above and developing the methods under which costs and revenues will be determined. The protocol is available on the CMS website at www.cms.hhs.gov/MedicaidGenInfo/Downloads/CMS2198FRptProtocol.pdf.

The protocol requires that hospitals proportionately allocate all costs and revenues in each financial and cost reporting period to determine costs and revenues associated with the Medicaid state plan rate year. The hospitals should utilize one of the following methods of allocating data from multiple cost reports in order to calculate costs and revenues associated with the Medicaid State plan rate year:

### Method 1

A. Cost Report #1 - Hospitals should calculate DSH eligible hospital cost and revenues for the time period relating to the portion of the cost report applicable to the State plan rate year under audit. Cost center specific routine per diems and ancillary ratios of costs to charges (RCC) from the cost report should be used. The per diems and cost-to-charge ratios will be applied to days and charges from MMIS or other sources for services specific to the portion of the cost reporting period that coincides with the state plan rate year. The established revenue identification process described in the General DSH Audit and Reporting Protocol should be used for the partial period.

B. Cost Report #2 - Hospitals should calculate DSH eligible hospital cost and revenues for the time period relating to the portion of the cost report applicable to the State plan rate year under audit. Cost center specific routine per diems and ancillary ratios of costs to charges (RCC) from the cost report should be used. The per diems and cost-to-charge ratios will be applied to days and charges from MMIS or other sources for services specific to the portion of the cost reporting period that coincides with the state plan year. The established revenue identification process described in the General DSH Audit and Reporting Protocol should be used for the partial period.

C. The sum of A and B should represent DSH eligible hospital costs and revenues for the State plan rate year under audit.

### Example Calculation

Cost Report #1 (January 1, 2010 – December 31, 2010)

Cost Report #2 (January 1, 2011 – December 31, 2011)

State Plan Rate Year (July 1, 2010 – June 30, 2011)

A. Total DSH Eligible Hospital State Plan Rate Year Costs for July 1, 2010 through December 31, 2010 = Costs Report #1 DSH Eligible Hospital Costs for the Period July 1, 2010 – December 31, 2010, computed using routine per diems and ancillary cost-to-charge ratios from the cost report for the period of January 1, 2010-December 31, 2010, applied to Medicaid and uninsured days and charges for the period of July 1, 2010-December 31, 2010, offset by applicable revenues for the period of July 1, 2010-December 31, 2010.

B. Total DSH Eligible Hospital State Plan Rate Year Costs for January 1, 2011 through June 30, 2011 = Costs Report #1 DSH Eligible Hospital Costs for the Period January 1, 2011 through June 30, 2011, computed using routine per diems and ancillary cost-to-charge ratios from the cost report for the period of January 1, 2011-December 31, 2011, applied to Medicaid and uninsured days and charges for the period of January 1, 2011-June 30, 2011, offset by applicable revenues for the period of January 1, 2011-June 30, 2011.

C. The sum of A and B should represent total DSH eligible hospital costs and revenues for the State plan rate year under audit.

### Method 2

A. Cost Report #1 - Hospitals should follow the established 2552-96 cost reporting and apportionment process and the revenue identification process described in the General DSH Audit and Reporting Protocol for the full cost report year that includes a portion of costs and revenues applicable to the Medicaid State plan rate year under audit. DSH eligible hospital costs and revenues identified for the cost report year should be multiplied by the percentage of the cost report year applicable to the State plan rate year under audit. The product should represent DSH eligible hospital costs and revenues for a portion of the State plan rate year.

B. Cost Report #2 - Hospitals should follow the established 2552-96 cost reporting and apportionment process and the revenue identification process described in the General DSH Audit and Reporting Protocol for the full cost report year that includes a portion of costs and revenues applicable to the Medicaid State plan rate year under audit. DSH eligible hospital costs and revenues identified for the cost report year should be multiplied by the percentage of the cost report year applicable to the State plan rate year under audit. The product should represent DSH eligible hospital costs and revenues for a portion of the State plan rate year.

C. The sum of A and B should represent DSH eligible hospital costs and revenues for the State plan rate year under audit.

Example Calculation

Cost Report #1 (January 1, 2010 – December 31, 2010)

Cost Report #2 (January 1, 2011 – December 31, 2011)

State Plan Rate Year (July 1, 2010 – June 30, 2011)

A. Total DSH Eligible Hospital State Plan Rate Year Costs and Revenues for July 1, 2010 through December 31, 2010 = Costs Report #1 Total DSH Eligible Hospital Costs and Revenues * 50%

B. Total DSH Eligible Hospital State Plan Rate Year Costs and Revenues for January 1, 2011 through June 30, 2011 = Costs Report #2 Total DSH Eligible Hospital Costs and Revenues * 50%

C. The sum of A and B should represent DSH eligible hospital costs and revenues for the State plan rate year under audit.

## State-Developed DSH Audit Protocol

### 22. Are states required to develop an audit protocol? If so, how can states ensure that it has satisfied audit protocol requirements?

Yes, states are required to develop and to distribute to hospitals and the auditors an audit protocol for use by DSH hospitals to determine costs. Item #2 under States' Areas of Responsibility, from the CMS General DSH Audit and Reporting Protocol, specifies that states are responsible for developing an audit protocol for use by DSH hospitals to determine costs. In addition, CMS' Additional Information on the DSH Reporting and Audit Requirements emphasizes that the Audit and Reporting protocol should be used as a tool in collecting the necessary data and information.

States must develop this DSH audit protocol for use by DSH hospitals and cannot rely solely on their independent certified auditors to provide the instructions to hospitals, to provide training to the hospitals, and to collect required data. The state must ensure that the audit protocol complies with the federal requirements. In addition, the state should provide the auditor and the hospitals with applicable instructions of data elements required in accordance with the final rule.

### 23. What information should be included in the state-developed DSH audit protocol?

The protocol should serve as a guide to hospitals in determining costs in accordance with federal requirements. It should include instructions identifying the relevant sections of the cost report that reflect costs eligible for inclusion in developing the hospital-specific DSH limit and must replace any current DSH survey information utilized by states. This protocol should include identification of all relevant hospital cost reports and financial statements and other auditable hospital accounting records associated with the audited Medicaid SPRY necessary for calculating hospital-specific DSH limits.

# State Procedures and Internal Controls

### 24. Are state internal control policies and procedures required for purposes of administering and overseeing the DSH program?

In administering federal programs, states are required to have and maintain effective internal controls of those programs. With effective internal controls, states can provide reasonable assurance that they are administering the programs in compliance with applicable laws, regulations, and policies. States can also ensure that their financial reports are complete, accurate, and supported.

For the Medicaid program, states are responsible to have adequate internal controls in place to ensure that all Medicaid expenditures reported for FFP, including DSH expenditures, are complete, accurate, and supported.

- Per 45 CFR 92.20(b), the financial management systems of other grantees and subgrantees must meet the following standards:

    (3) Internal control. Effective control and accountability must be maintained for all grant and subgrant cash, real and personal property, and other assets. Grantees and subgrantees must adequately safeguard all such property and must assure that it is used solely for authorized purposes.

- Per OMB Circular No. A-133, Subpart C – Auditees, § .300 Auditee responsibilities, the auditee shall:

    (b) Maintain internal control over Federal programs that provides reasonable assurance that the auditee is managing Federal awards in compliance with laws, regulations, and the provisions of contracts or grant agreements that could have a material effect on each of its Federal programs.

### 25. Why are internal controls important?

Without adequate internal controls, the estimated and actual hospital-specific DSH limits may significantly differ from the limits based on the audited actual data. This may impose financial hardships on hospitals whose excess DSH payments are subject to be recouped or redistributed.

States should implement appropriate internal control procedures to ensure the information used to estimate the hospital-specific DSH limit is accurate and supported. Additionally, they should implement appropriate internal control procedures by providing sufficient instructions to hospitals and auditors, providing and adequate oversight of the independent audit and related reported data. These internal controls will assist in ensuring that the information used to estimate and calculate the hospital-specific DSH limit and to compile the DSH data elements report is accurate, compliant with federal requirements, and sufficiently documented.

## Non-Qualified Hospitals Receiving Payments

### 26. What happens if SPRY 2011 and after DSH audits and reports show that some hospitals were not eligible to receive DSH payments during the state plan rate year under audit?

All hospitals that receive DSH payments must meet minimum qualifying requirements under section 1923(d) of the Social Security Act and must meet all state plan DSH qualifying requirements in the approved state plan in effect for the state plan rate year under audit. This includes the requirement to have a provider agreement with the state. If an audit or associated report for SPRY 2011 or after identifies any hospitals that did not meet these requirements, CMS will regard this as representing discovery of overpayments to providers that, pursuant to 42 CFR Part 433, Subpart F, triggers the return of the federal share to the federal government. However, if the approved state plan in effect for that fiscal year has a methodology to redistribute excess DSH that are identified by the audit, the state should rely on this approved methodology to redistribute these excess payment amounts.

## Medicaid Inpatient Utilization Rate (MIUR) and Low-Income Utilization Rate (LIUR)

### 27. 42 CFR 447.299(c)(3) requires that states report the Medicaid Inpatient Utilization Rate (MIUR), as defined in section 1923(b)(2) of the Act, for each hospital receiving a DSH payment. If states calculate the MIUR differently than as required in 1923(b) of the Act, what should the state report?

If the approved state plan relies on the MIUR threshold as calculated in section 1923(b)(2) of the Act to qualify hospitals as eligible for DSH under the state plan, states must report the MIUR

in the 42 CFR 447.299(c)(3) cell of the data elements report. However, if the state instead relies on alternate qualifying criteria in the approved state plan methodology for qualifying DSH hospitals, including a state-defined version of MIUR, it should report the alternate statistic in the 42 CFR 447.299(c)(5) cell of the data element report in lieu reporting in the MIUR cell. Please note that if the state reports the alternate qualifying criteria, it must include a footnote on the data element spreadsheet specifying the methodology used to determine that statistic.

Though they are not required to report the MIUR as part of the data elements report, states that rely on state-defined alternate qualifying criteria must still follow requirements of sections 1923(b) and 1923(d) of the Act. States are responsible for ensuring that all hospitals meeting the requirements of section 1923(b) of the Act receive a DSH payment. Additionally, states must ensure that only hospitals that have an MIUR of at least one percent as defined in section 1923(d) of the Act qualify to receive a DSH payment under the state plan.

Regardless of whether states uses alternate qualifying criteria, it is important that states calculate the MIUR for purposes of 1923(b) and (d) correctly. The MIUR as defined in section 1923(b)(2) for a hospital is a fraction (expressed as a percentage), the numerator of which is the hospital's number of inpatient days attributable to patients who (for such days) were eligible for medical assistance under a State plan approved under Title XIX of the Act in a period (regardless of whether such patients receive medical assistance on a fee-for-service basis or through a managed care entity), and the denominator of which is the total number of the hospital's inpatient days in that period. The term "inpatient day" includes each day in which an individual (including a newborn) is an inpatient in the hospital, whether or not the individual is in a specialized ward and whether or not the individual remains in the hospital for lack of suitable placement elsewhere.

In determining inpatient days, days associated with patients that are dually eligible for Medicaid and Medicare, as well as days associated with patients that are dually eligible for Medicaid and private insurance, must be included in the numerator of the MIUR equation. States must calculate the MIUR for all hospitals receiving Medicaid payments in the state, not just hospitals receiving DSH payments, to determine whether or not a hospital is deemed a DSH hospital per 1923(b)(1)(A).

### 28. 42 CFR 447.299(c)(4) requires that states report the Low-Income Utilization Rate (LIUR), as defined in section 1923(b)(3) of the Act, for each hospital receiving a DSH payment. If states calculate the LIUR differently than as required in 1923(b) of the Act, what should the state report?

If the approved state plan relies on the LIUR threshold as calculated in section 1923(b)(2) of the Act to qualify hospitals as eligible for DSH under the state plan, states must report the LIUR in the 42 CFR 447.299(c)(4) cell of the data elements report. However, if the state instead relies on alternate qualifying criteria in the approved state plan methodology for qualifying DSH hospitals, including a state-defined version of LIUR, it should report the alternate statistic in the

42 CFR 447.299(c)(5) cell of the data element report in lieu reporting in the LIUR cell. Please note that if the state reports the alternate qualifying criteria, it must include a footnote on the data element spreadsheet specifying the methodology used to determine that statistic.

Though they are not required to report the LIUR as part of the data elements report, states that rely on state-defined alternate qualifying criteria must still follow requirements of sections 1923(b) and 1923(d) of the Act. States are responsible for ensuring that all hospitals meeting the requirements of section 1923(b) of the Act receive a DSH payment. Additionally, states must ensure that only hospitals that have an MIUR of at least one percent as defined in section 1923(d) of the Act qualify to receive a DSH payment under the state plan.

Regardless of whether states uses alternate qualifying criteria, it is important that states calculate the LIUR correctly for purposes of 1923(b). States should ensure that the numerator at section 1923(b)(3)(B) is the total amount of the hospital's charges for inpatient hospital services which are attributable to charity care in a period, less the portion of any cash subsidies in the period reasonably attributable to inpatient hospital services.

## State Plan Issues

### 29. How can a state ensure that it has a Medicaid state plan DSH methodology that meets federal DSH requirements, including DSH audit and reporting requirements?

To ensure that DSH payments and the DSH audits and reports comport with section 1923(j) of the Act, implementing regulations at 42 CFR 447.299 and 42 CFR 447 Subpart D, and related guidance, there are certain criteria that states should including in their Medicaid State plan to ensure that DSH payments will be calculated in accordance with statutory and regulatory provisions:

- The State plan should specify that only hospitals that meet the minimum DSH provider qualification requirements at section 1923(d) of the Social Security Act qualify as DSH hospitals.

- The State plan should clearly define how hospital-specific DSH limits are calculated. The calculation method should meet all federal requirements, including the December 19, 2008 DSH Audit and Reporting Final Rule and associated guidance. The description of the calculation should include the definition of costs and revenues used to determine uncompensated care costs and the populations whose services are included in the calculation.

- The State plan should accurately describe the actual policies and procedures followed by the state in administering the DSH program. This requires that the state maintain clear and comprehensive written documentation of their DSH policies and procedures.

- States retain considerable flexibility in setting DSH State plan payment methodologies to the extent that such methodologies are consistent with 1923(c) and all other applicable statute and regulations. Regardless of this flexibility, the state plan should rely on DSH payment methodologies do not result in payments that significantly exceed hospital-specific limits.

### 30. Can states modify their state plans to avoid having to repay the federal portion of DSH overpayments to CMS after the regulatory transition period?

State have the opportunity to amend their Medicaid state plans requiring state recoupment and redistribution of overpayments as CMS advised in the 2008 DSH final rule and the CMS Information Bulletin released on June 21, 2011. Additionally, states can modify their prospective payment methodologies to ensure payment accuracy in advance of the calculation of the final hospital-specific DSH limit. The proposed SPA establishing a redistribution methodology must be submitted by the last day of the SPRY to preserve an effective for that SPRY.

### 31. If there is a particular hospital service that is only covered under the state plan at particular hospitals or particular categories of hospitals, would the cost of such service be allowable as a hospital service cost for other hospitals? Or, for these other hospitals, would the service be treated as a service that falls outside of what the state plan defines as a covered hospital inpatient or hospital outpatient service?

Regardless of whether a state plan defines a hospital service as a covered service only when furnished by limited facilities, any hospital that provides such a service can include allowable costs when calculating the hospital-specific DSH limit. For inclusion in calculating the limit, the service must be within the scope of the state plan's definition of inpatient or outpatient hospital services and must be provided to an individual eligible for Medicaid or with no source of third party coverage.

## Section 1115 Demonstrations and Medicaid DSH

**32. Are payments made under a section 1115 demonstration required to be offset against hospital costs when calculating the hospital-specific DSH limit?**

Any demonstration payments that are payments made to a hospital for inpatient and outpatient hospital services furnished to Medicaid or uninsured individuals should be counted as Medicaid or uninsured revenues for the calculation of the hospital-specific DSH limit. If the approved terms of the demonstration require treatment of the payments as DSH payments, the state must instead report the payments as DSH payments for Medicaid DSH audit and reporting purposes.

**33. How are states that have approved section 1115 demonstrations authorizing payments to hospitals for uncompensated care costs required to account for Medicaid DSH payments?**

States must ensure that section 1115 demonstration payments made to hospitals for uncompensated care costs are offset when calculating the hospital-specific DSH limit. States are only permitted to make DSH payments that do not exceed the hospital-specific DSH limit.

## Certified Public Expenditures

**34. There are states where the Medicaid State plan or a section 1115 demonstration authorizes the state to fund its Medicaid hospital or DSH payments by certified public expenditures (CPE). A cost protocol is approved for the CPE process which prescribes the cost reports used, the Medicaid and/or uninsured cost computation, and the cost reconciliation steps. Does the approved DSH CPE process override the DSH independent audit requirements?**

No, the DSH CPE process does not override the DSH independent audit requirements. Where the state and auditors look to or rely on elements of the CPE process as part of its DSH audit, there needs to be an audit determination that those elements from the CPE process, including the cost report used and the computation of Medicaid or uninsured uncompensated care costs, are in compliance and consistent with the final DSH rule. Furthermore, the timing of the CPE process may not match that of the independent audit process.

## Obstetric Services Requirement

**35. Psychiatric and rehabilitation hospitals generally do not provide non-emergency obstetric services. If such a hospital was first opened after December 22, 1987 and did not offer non-emergency obstetric services, would it be considered exempt from the obstetric requirement?**

Section 1923(d) of the Social Security Act includes exceptions to obstetrical service requirements in that section of the statute. Hospitals that did not offer nonemergency obstetrical services to the general population as of December 22, 1987, are excepted from the two-physician rule. The law does not contemplate a grandfathering clause or otherwise make exception to the obstetric requirement for hospitals that came into existence after December 22, 1987; therefore, such hospitals would not be considered exempt from the obstetrician requirement at section 1923(d) of the Act.

## Medicaid Inpatient Utilization Rate (MIUR)/Low-Income Utilization Rate (LIUR)

**36. To determine estimated DSH payments and initial DSH eligibility statistics, many states use MIUR and LIUR data from a prior year to ensure timely payments to providers. Are states required to adjust qualification and payment when the MIUR and/or LIUR data is available from the actual SPRY?**

CMS clarified in the 2008 DSH final rule that states will continue to have the flexibility to use MIUR and LIUR data from time periods other than the Medicaid SPRY to estimate DSH qualification and DSH payments, but must provide for adjustments to ensure that final qualification and payments are based on MIUR and LIUR and LIUR data from the actual SPRY. If a hospital initially qualified using prior year data, but no longer meets the qualification criteria based on actual SPRY data, the state must recoup any DSH payment made to that hospital and return the federal share to CMS unless the state has a redistribution methodology in its approved state plan. Conversely, if a state determines that a hospital that did not preliminarily qualify using prior year data later meets the qualification criteria using actual SPRY MIUR or LIUR data, the state must make a DSH payment to those hospital in accordance with the approved state plan in effect during the SPRY for which the actual data is used.

**37. Section 1923(b)(1)(a) of the Act requires that states determine the MIUR of all hospitals receiving DSH payments in the state for deeming hospitals as DSH. Are states required to use a prior year estimate for purposes of this calculation or are states required to use actual data?**

States must obtain the actual data for the relevant state plan rate year for the MIUR for all Medicaid hospitals. We are not, however, expecting that the MIURs for non-DSH, Medicaid hospitals be audited as part of the independent audit. However, the data for the MIURs for the Medicaid hospitals would be collected in the same manner that the state collects this data for the initial DSH qualification determination, except that the actual state plan rate year period is used.

## Auditor Independence

### 38. Can states hire an entity to conduct the independent certified DSH audit if the Medicaid Agency has or had a contract with the same entity to calculate Medicaid DSH payments or hospital-specific DSH limit?

Medicaid regulations at 42 CFR 455.301 define an independent certified audit, in part, to mean an audit that is conducted by an auditor that operates independently from the Medicaid agency or subject hospital. The intent is for the auditor to be fully able to render objective and impartial judgment on all matters relating to a required DSH audit. The term "independent" means that the Single State Audit Agency or any other CPA firm that operates independently from the Medicaid agency or subject hospitals is eligible to perform the DSH audit. States may not rely on non-CPA firms, fiscal intermediaries acting as Agents for a State's Medicaid program, or on certification programs currently in place to audit uncompensated care costs. Nor can states simply expand hospital financial statements to obtain audit certification of the hospital specific DSH limits.

CMS provided guidance on auditor independence to states in the Additional Information on the DSH Reporting and Audit Requirements document published subsequent to the 2008 DSH audit and reporting finale rule. This guidance reinforced the responsibility of states to ensure that no possible impairment exists between the auditing organization/auditors and the Medicaid agency and/or hospital and required that states and auditors follow the GAGAS standards in ensuring independence.

Specifically, the guidance provided a list of potential conflicts regarding independence, including an auditor performing work relating to State plan DSH payments aside from the independent certified audit. It is possible that the auditing entity could have appropriate firewalls in place to eliminate potential impairments to independence so that the audit entity meets the GAGAS independence standards. If the state and the auditor believe that the meets it these standards despite a potential impairment (including those listed in Chapter 3 of the GAO's GAGAS standards, CMS guidance, or any other potential conflict not listed in those guidance documents), the state must submit the following along with its annual independent certified audit and associated report:

1. A written narrative justifying how the audit entity meets the GAGAS independence standards despite the appearance that the auditing entity is not independent.
2. A signed statement from the audit entity declaring independence of the respective Medicaid agency and hospitals (please note that this is a standard requirement for all states).

States are responsible for ensuring that auditors that they contract with meet the auditor independence requirements. CMS will not accept any DSH audits or reports from states that do not submit the two required items. Additionally, CMS will not accept audits or reports from states that utilize auditors that have impairments to independence.

### 39. Are states permitted to use Medicare contractors to conduct the independent certified audit required by section 1923(j) of the Social Security Act?

States may use a Medicare contractor to conduct the independent certified DSH audit only if the Medicare contractor meets the definition of an independent CPA firm and operates under a contract that ensures independence. States may also use Medicaid agency auditors to gather the data and perform initial data analysis for the DSH audit. However, the audit must be certified by an independent auditor.

CMS's Additional Information on the DSH Reporting and Audit Requirements provided additional guidance regarding the DSH auditor independence requirements. Specifically, this policy document requires state and auditor compliance with Chapter 3 of the General Accountability Office's (GAO) most recent revision to Government Auditing Standard, which identifies specific criteria for independence and outlines impairments to independence in government auditing practices ( http://www.gao.gov/govaud/govaudhtml/index.html ).

We recognize that there are Medicare contractors conducting DSH audits. At least two audit reports contained numerous disclaimers and qualifications about complying with Chapter 3 of generally accepted government audit standards (GAGAS) "yellow book" standards. The nature of the work of the Medicare contractors could lead to the potential impairments to independence. Further, we understand that many, if not most, Medicare contractors have common audit agreements in place with Medicaid agencies for which they are conducting the DSH work. We view contracting with Medicare contractors as a potential conflict to auditor independence. Accordingly, states that contract with Medicare contractors for DSH audit purposes must submit the signed independence statement and the explanation of independence described in the preceding response for each SPRY in which they utilize a Medicare contractor to conduct the DSH audit.

## Revenue Reporting

40. The General DSH Audit and Reporting Protocol is specific in that uninsured revenues are reported based on when the payments are received and that there is no attempt to allocate payments received during the state plan rate year to services provided in prior periods. Does this same policy apply to Medicaid revenues? Please clarify whether revenues pertaining to services furnished to Medicaid eligibles should be tied back to the service periods.

The General DSH Audit and Reporting Protocol sets forth an exception to the general rule that revenues should be tied back to the service periods for uninsured revenues. Since this exception does not apply to Medicaid revenues, all revenues pertaining to services furnished to Medicaid eligibles should be tied back to the service periods. In other words, there is a matching of revenues to the costs of services incurred during the state plan rate year. This applies to all revenue sources for the Medicaid eligible services, including but not limited to payments from the state (home state or out of state), Medicare and third party payers, the Medicaid recipient, and Medicaid managed care plans. We provided an exception only for uninsured payments in the CMS guidance due to the feedback we received on the inconsistent nature and timing of uninsured payments.

41. Are grants considered to be uninsured revenues requiring offset in the computation of the hospital-specific DSH limit? Does it matter whether the grant is a federal grant, a private grant, or a state/local government grant? Does it matter whether the grant is earmarked for specific purposes or uses at the hospital?

Any grant that can be attributed, in part or in whole, to Medicaid and/or uninsured hospital patient care, would be considered a revenue for Medicaid and uninsured services and, therefore, must be included as offset in the computation of the hospital-specific DSH limit. Any identifiable portion that is earmarked for purposes unrelated to Medicaid and/or uninsured hospital patient care can be excluded from the offset. Also, any grant that is determined to be an indigent program payment from a state-only or local-only governmental entity is not offset; this type of payment is not considered to be a source of third party payment in accordance with Section 1923(g)(1)(A) of the Social Security Act.

## Resources for States, Hospitals, and Auditors

42. What resources are available on the DSH audit and reporting requirements for states, hospitals, and auditors?

The following is a list of web links to Federal Medicaid DSH audit and reporting requirements:

Section 1923 of the Social Security Act
http://www.ssa.gov/OP_Home/ssact/title19/1923.htm

December 19, 2008 DSH Audit and Reporting Final Rule
http://www.gpo.gov/fdsys/pkg/FR-2008-12-19/pdf/E8-30000.pdf

April 24, 2009 DSH Audit and Reporting Rule Correcting Amendment
http://www.gpo.gov/fdsys/pkg/FR-2009-04-24/pdf/E9-9232.pdf

September 18, 2013 Additional DSH Reporting Requirements Rule
http://www.gpo.gov/fdsys/pkg/FR-2013-09-18/pdf/2013-22686.pdf

General DSH Audit and Reporting Protocol
http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Financing-and-Reimbursement/Downloads/General_DSH_Audit_Reporting_Protocol.pdf

Additional Information on the DSH Reporting and Audit Requirements
http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Financing-and-Reimbursement/Downloads/AdditionalInformationontheDSHReporting.pdf

July 17, 2009 DSH Audit and Reporting Compliance Enforcement Delay Letter
http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Financing-and-Reimbursement/Downloads/DSH-Guidance71709.pdf

DSH Report Format Template
http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Financing-and-Reimbursement/Downloads/DSHReportFormat.pdf

Medicaid.gov DSH Page
http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Financing-and-Reimbursement/Medicaid-Disproportionate-Share-Hospital-DSH-Payments.html

## CONTRACT BETWEEN THE
## DIVISION OF MEDICAID
## OFFICE OF THE GOVERNOR
## STATE OF MISSISSIPPI
## AND
## MYERS AND STAUFFER, LLC
## FOR
## ADMINISTRATIVE AND TECHNICAL SUPPORT FOR OPERATIONS OF THE UPL, DSH AND IGT PROGRAMS

THIS CONTRACT is made and entered into between the DIVISION OF MEDICAID, OFFICE OF THE GOVERNOR, STATE OF MISSISSIPPI, an administrative agency (hereinafter the "DOM"), and MYERS AND STAUFFER, LLC a corporation qualified to do business in Mississippi (hereinafter "Contractor").

### WHEREAS:

In May 2006, DOM issued a Request for Proposals (RFP# 2006-503-01) for Administrative and Technical Support for Operations of the UPL, DSH and IGT Programs (hereinafter "RFP"), which requested that a Proposal be submitted to DOM; and

### WHEREAS:

The Contractor's proposal in response to the RFP was selected by DOM and the Contract awarded to Contractor; and

### WHEREAS:

Changes in the federal DSH audit regulation have increased the complexity of the DSH/UPL payment methodologies and reimbursement systems and necessitate the collection of significant additional data;

## NOW, THEREFORE, IT IS AGREED BETWEEN THE DIVISION AND CONTRACTOR THAT:

### ARTICLE I.

### ENTIRE AGREEMENT

A.    With the exception of the termination date and price, the parties agree to enter this Contract under the same terms and conditions as agreed to in the previous contract which terminates June 30, 2010. Therefore, the RFP referenced in its entirety, together with all attachments, exhibits, appendices, and amendments, the

Page 1 of 8


EXHIBIT
B

Proposal of Contractor (including financials), together with all attachments, exhibits and appendices, written questions and answers, and the transcripts of the question and answer part of the oral presentation are made a part of this Contract as fully as if set forth herein and its terms are made the terms of this Contract. The RFP is labeled as Attachment A. The Technical Proposal and attachments submitted by Contractor are labeled as Attachment B. The Business Proposal is labeled as Attachment C. The RFP Bidder Questions and Answers are labeled as Attachment D.

B.   In the event of a dispute or conflict in interpreting the Contract, the Contract, without the Contract's incorporated material, shall be the first controlling. After the Contract, the order of priority shall be as follows: the RFP Bidder Questions and Answers (Attachment D), the Business Proposal (Attachment C), the Technical Proposal and its attachments (Attachment B), and the RFP (Attachment A). All the documents shall be read and construed as far as possible to be one harmonious whole; however, in the event of a conflict or dispute, the above list is the list of priority.

## ARTICLE II.
## SCOPE OF WORK

The Scope of Work provisions as described in Section 3 of the RFP are made a part of this Contract as fully as if set forth herein and its terms are made the terms of this Contract.

## ARTICLE III.
## CONTRACT PRICE

The total amount payable by DOM to the Contractor under this Contract shall be limited as described in the Contractor's Business Proposal and shall not exceed $258,225 per year for services rendered. All other payments and terms thereof shall be made as described in Section 4 of the RFP.

## ARTICLE IV.
## TERMS AND CONDITIONS

The Terms and Conditions of this Contract are those set forth in RFP Section 5 in whole

Page 2 of 8

and in part, which are fully and wholly incorporated herein in addition to the following:

## REPRESENTATION REGARDING GRATUITIES

The Contractor represents that it has not violated, is not violating, and promises that it will not violate the prohibition against gratuities set forth in Section 7-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

## STOP WORK ORDER

1. Order to Stop Work - The DOM Contract Administrator may, by written order to the Contractor at any time and without notice to any surety, require the Contractor to stop all or any part of the work called for by this contract. This order shall be for a specified period not exceeding Ninety (90) days after the order is delivered to the Contractor, unless the parties agree to an extension. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Contractor shall forthwith comply with its terms and take all reasonable steps to minimize the occurrence of costs allowable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within an extension to which the parties shall have agreed, the Contract Administrator shall either:

   a. cancel the stop work order; or

   b. terminate the work covered by such order as provided in the "Termination for Default Clause" or the "Termination for Convenience Clause" of this contract.

2. Cancellation or Expiration of the Order - If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Contractor shall have the right to resume work. An appropriate adjustment shall be made in the delivery schedule or Contractor price, or both, and the contract shall be modified in writing accordingly, only if:

   a. the stop work order or extension results in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract; and,

      b.  the Contractor asserts a claim for such an adjustment within thirty (30) days after the end of the stop work order or extension.

3.  Termination of Work - If a stop work order or extension is not canceled and the work covered by such stop work order or extension is terminated for default or convenience, adjustment to the contract price will be negotiated between DOM and the Contractor.

## COMPLIANCE WITH LAWS

The Contractor understands that DOM is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Contractor agrees during the term of the Contract that the Contractor will strictly adhere to this policy in its employment practices and provision of services. The Contractor shall comply with, and all activities under this Contract shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

## COMPLIANCE WITH MISSISSIPPI EMPLOYMENT PROTECTION ACT (MEPA)

Contractor/Seller represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Section 71-11-1 et seq of the Mississippi Code Annotated (Supp 2008), and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Contractor/Seller agrees to maintain records of such compliance and, upon request of the State and approval of the Social Security Administration or Department of Homeland Security, where required, to provide a copy of each such verification to the State. Contractor/Seller further represents and warrants that any person assigned to perform services hereunder meets the employment

eligibility requirements of all immigration laws of the State of Mississippi.
Contractor/Seller understands and agrees that any breach of these warranties may subject
Contractor/Seller to the following: (a) termination of this Agreement and ineligibility for
any state or public contract in Mississippi for up to three (3) years, with notice of such
cancellation/termination being made public, or (b) the loss of any license, permit,
certification or other document granted to Contractor/Seller by an agency, department or
governmental entity for the right to do business in Mississippi for up to one (1) year, or
(c) both. In the event of such termination/cancellation, Contractor/Seller would also be
liable for any additional costs incurred by the State due to contract cancellation or loss of
license or permit.

## ELECTRONIC PAYMENT AND INVOICING

The State requires the Contractor to submit invoices electronically throughout the term of
the agreement. Vendor invoices shall be submitted to the state agency using the
processes and procedures identified by the State. Payments by state agencies using the
Statewide Automated Accounting System (SAAS) shall be made and remittance
information provided electronically as directed by the State. These payments shall be
deposited into the bank account of the Contractor's choice. Contractor understands and
agrees that the State is exempt from the payment of taxes. All payments shall be in
United States currency.

## ARTICLE V.

## TERM OF THE CONTRACT

This contract shall be effective July 1, 2010, and shall terminate on June 30, 2012, unless
the contract is terminated earlier pursuant to the provisions described in Article IV of this
Contract.

## ARTICLE VI.

## MODIFICATIONS

No modification or change of any provision in this Contract shall be made, or construed
to have been made, unless such modification or change is mutually agreed upon in writing by the
Contractor and DOM. The agreed upon modification or change will be incorporated as a written

contract amendment and processed through DOM for approval prior to the effective date of such modification or change. The only representatives authorized to modify this Contract on behalf of DOM and the Contractor are as follows:

Contractor:    Kevin C. Londeen, 11440 Tomahawk Creek Parkway, Leawood, Kansas 66211.

DOM:    Robert L. Robinson, Executive Director, 550 High Street, Suite 1000, Jackson, Mississippi 39201.

## ARTICLE VII.

### NOTICES

Notices under this Contract shall be addressed as follows:

A.    In case of notice to the Contractor:

Kevin C. Londeen
Myers and Stauffer, LLC
11440 Tomahawk Creek Parkway
Leawood, Kansas 66211

B.    In case of notice to DOM:

Executive Director
Division of Medicaid
550 High Street, Suite 1000
Jackson, Mississippi 39201

IN WITNESS WHEREOF, the parties hereto have executed this contract in duplicate

originals on the day herein written.

DIVISION OF MEDICAID
OFFICE OF THE GOVERNOR
STATE OF MISSISSIPPI

BY: _____
ROBERT L. ROBINSON
EXECUTIVE DIRECTOR

MYERS AND STAUFFER, LLC

BY: _____
KEVIN C. LONDEEN

Page 6 of 8

PRESIDENT

BY: _____

SECRETARY OF THE CORPORATION

(CORPORATE SEAL)

**STATE OF MISSISSIPPI**
**COUNTY OF HINDS**

THIS DAY personally came and appeared before me, the undersigned authority, in and for the aforesaid jurisdiction, the within named, **Robert L. Robinson,** in his official capacity as the duly appointed Executive Director of the Division of Medicaid in the Office of the Governor, an administrative agency of the State of Mississippi, who acknowledged to me, being first duly authorized by said Division that he signed and delivered the above and foregoing written Contract for and on behalf of said Division and as its official act and deed on the day and year therein mentioned.

GIVEN under my hand and official seal of office on this the _____ day of
_____, A.D., 2010.

NOTARY PUBLIC

My Commission Expires
ID No.
59424
NOTARY PUBLIC
Comm. Expires
April 7, 2011

STATE OF _____

COUNTY OF _____

THIS DAY personally came and appeared before me, the undersigned authority, in and for the aforesaid jurisdiction, the within named, **Kevin C. Londeen, and**
James D Erickson in his/her respective capacities as the **PRESIDENT and SECRETARY** of Myers and Stauffer, LLC, a corporation authorized to do business in Mississippi, who acknowledged to me, being first duly authorized by said corporation that (s)he signed and delivered the above and foregoing written Contract for and on behalf of said corporation and as its official act and deed on the day and year therein mentioned.

GIVEN under my hand and official seal of office on this the 21st _____ day of June, A.D., 2010.

**My Commission Expires:**

October 10, 2011

**NOTARY PUBLIC**

Sheila Ruakline

Notary Public - State of Kansas
SHEILA LAUGHLIN
My Commission Expires 10-10-11

Page 8 of 8

**CONTRACT BETWEEN THE
DIVISION OF MEDICAID
OFFICE OF THE GOVERNOR
STATE OF MISSISSIPPI
AND
MYERS AND STAUFFER, LC
(AUDIT SERVICES)**

THIS CONTRACT is made and entered into by and between the **DIVISION OF MEDICAID, OFFICE OF THE GOVERNOR**, an administrative agency of the STATE OF MISSISSIPPI (hereinafter "DOM"), and **MYERS AND STAUFFER, LC**, a corporation qualified to do business in Mississippi (hereinafter "Contractor"), for the performance of professional services.

FOR AND IN CONSIDERATION of the mutual covenants contained herein and subject to the terms and conditions hereinafter stated, it is hereby understood and agreed by the parties hereto as follows:

### ARTICLE I

### ENTIRE AGREEMENT

A. The Contract together with all attachments, exhibits and appendices, are made a part of this Contract as fully as if set forth herein and its terms are made the terms of this Contract.

B. In the event of a dispute or conflict in interpreting the Contract, the Contract, without the Contract's incorporated material, shall be the first controlling. All the documents shall be read and construed as far as possible to be one harmonious whole.

### ARTICLE II

### SCOPE OF WORK

A. The Contractor agrees to perform the following services for the Medicaid agency:

1. Perform verification procedures on critical data elements used by Mississippi health care providers for Medicaid reimbursement, as requested by DOM.

2. Perform verification procedures of Medicaid Disproportionate Share Hospital (DSH) payments, including an Upper Payment Limit (UPL) analysis.

3. Develop and submit Audit Plans and Audit Manuals.

4. Complete Audits and Desk Reviews.

5. Provide training to DOM staff as requested.

6. Provide other special accounting consulting services as requested.

Page 1 of 14



EXHIBIT
C

7. All services provided in the scope of this Contract shall be performed in accordance with the Statement on Standards for Consulting Services of the American Institute of Certified Public Accountants.

8. Any other related services as required by the agency.

B. DOM shall:

1. Provide access to all physical locations as well as any floor plans or area maps.

2. Allow Contractor to interview any employee for the sole purpose of providing the services under this Agreement.

3. Provide access to all forms, whether paper or electronic, that the Contractor and DOM agree are relevant and necessary to complete the services under this Agreement.

4. Provide any/all information of electronic infrastructure that the Contractor and DOM agree is relevant and necessary to complete the services under this Agreement.

## ARTICLE III
## CONTRACT PRICE

The total amount payable under this Contract shall be limited to $750,000 for the term of the contract. The amount payable by DOM to the Contractor under this Contract shall be limited to a rate of $135 per hour. This hourly rate represents a blended rate for Member, Principal, Senior Manager, Manager, Senior Accountant/Analyst, Staff Accountant/Analyst, paraprofessional, and Administrative services. Travel costs shall be billed by Contractor and paid by agency in accordance with the travel regulations promulgated by the State of Mississippi's Department of Finance and Administration and DOM. Should Contractor require purchase of data from third party sources, Contractor will seek approval from DOM in advance, bill DOM only for actual cost incurred, and provide DOM with ownership of any and all data obtained.

Payments by state agencies using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State. These payments shall be deposited into the bank account of the Contractor's choice. The State may, at its sole discretion, require the Contractor to submit invoices and supporting documentation electronically at any time during the term of this Agreement. Contractor understands and agrees

Page 2 of 14

that the State is exempt from the payment of taxes. All other payments and terms thereof shall be made as described in subsequent letters of engagement.

## ARTICLE IV
## TERMS AND CONDITIONS

### APPLICABLE LAW

The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of law provisions, and any litigation with respect thereto shall be brought in the courts of the State. The Contractor shall comply with applicable federal, state and local laws and regulation.

### AVAILABILITY OF FUNDS

It is expressly understood and agreed that the obligation of DOM to proceed under this Agreement is conditioned upon the appropriation of funds by the Mississippi State Legislature and the receipt of federal and/or state funds. If the funds anticipated for the continuing fulfillment of the Agreement are, at any time, not forthcoming or insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the discontinuance or material alteration of the program under which funds were provided or if funds are not otherwise available to the Division, said insufficiencies shall constitute grounds for the voidance of this Agreement, without damage, penalty, cost or expenses to the Division of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.

### SEVERABILITY

It is understood and agreed by the parties hereto that if any part, term or provision of this Agreement is by the courts or other judicial body held to be illegal or in conflict with any law of the State of Mississippi or any federal law, the validity of the remaining portions or provisions shall not be affected and the obligations of the parties shall be construed in full force as if the Agreement did not contain that particular part, term, or provision held to be invalid.

### CONFIDENTIALITY

The Contractor agrees that it shall not use or disclose for any purpose any information concerning any recipient of services or provider of services that it may have access to or have knowledge of as a result of providing services to the Division. However, the obligation of confidentiality shall not apply to information that: (a) is or becomes in the public domain through no fault of the Contractor, or (b) is required to be disclosed pursuant to law or the legal process. This confidentiality agreement survives the term of the Agreement between the Division and the Contractor.

## REPRESENTATION REGARDING GRATUITIES

The Contractor represents that it has not violated, is not violating, and promises that it will not violate the prohibition against gratuities set forth in Section 7-204 (Gratuities) of the Mississippi Personal Service Contract Procurement Regulations.

## REPRESENTATION REGARDING CONTINGENT FEES

If applicable, the Consultant represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except as disclosed in the contractor's bid or proposal.

## STOP WORK ORDER

1. Order to Stop Work - The DOM Contract Administrator may, by written order to the Contractor at any time and without notice to any surety, require the Contractor to stop all or any part of the work called for by this contract. This order shall be for a specified period not exceeding Ninety (90) days after the order is delivered to the Contractor, unless the parties agree to an extension. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, the Contractor shall forthwith comply with its terms and take all reasonable steps to minimize the occurrence of costs allowable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within an extension to which the parties shall have agreed, the Contract Administrator shall either:

   a. cancel the stop work order; or

   b. terminate the work covered by such order as provided in the "Termination for

Page 4 of 14

Default Clause" or the "Termination for Convenience Clause" of this contract.

2. Cancellation or Expiration of the Order - If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, the Contractor shall have the right to resume work. An appropriate adjustment shall be made in the delivery schedule or Contractor price, or both, and the contract shall be modified in writing accordingly, only if:

   a. the stop work order or extension results in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract; and,

   b. the Contractor asserts a claim for such an adjustment within thirty (30) days after the end of the stop work order or extension.

3. Termination of Work - If a stop work order or extension is not canceled and the work covered by such stop work order or extension is terminated for default or convenience, adjustment to the contract price will be negotiated between DOM and the Contractor.

## COMPLIANCE WITH LAWS

The Contractor understands that DOM is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, or any other consideration made unlawful by federal, State, or local laws. All such discrimination is unlawful and the Contractor agrees during the term of the Contract that the Contractor will strictly adhere to this policy in its employment practices and provision of services. The Contractor shall comply with, and all activities under this Contract shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

## COMPLIANCE WITH MISSISSIPPI EMPLOYMENT PROTECTION ACT (MEPA)

Contractor/Seller represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Section 71-11-1 et seq of the Mississippi Code Annotated (Supp 2008), and will register and participate in the status verification system

for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Contractor/Seller agrees to maintain records of such compliance and, upon request of the State and approval of the Social Security Administration or Department of Homeland Security, where required, to provide a copy of each such verification to the State. Contractor/Seller further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Contractor/Seller understands and agrees that any breach of these warranties may subject Contractor/Seller to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license, permit, certification or other document granted to Contractor/Seller by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or (c) both. In the event of such termination/cancellation, Contractor/Seller would also be liable for any additional costs incurred by the State due to contract cancellation or loss of license or permit.

## PROCUREMENT REGULATION

The Contract shall be governed by the applicable provisions of the Personal Service Contract Review Board Regulations, a copy of which is available at 210 East Capitol Street, Jackson, MS, Suite 800 for inspection.

## PERFORMANCE STANDARDS, ACTUAL DAMAGES, LIQUIDATED DAMAGES AND RETAINAGE

DOM reserves the right to assess actual or liquidated damages, upon the Contractor's failure to timely provide services required pursuant to this contract. Actual or liquidated damages for failure to meet specific performance standards as set forth in the scope of work may be assessed as specifically set forth in each performance standard. The

Contractor shall be given fifteen (15) days' notice to respond before DOM makes the assessment. The assessments will be offset against the subsequent monthly payments to the Contractor. Assessment of any actual or liquidated damages does not waive any other remedies available to DOM pursuant to this contract or state or federal law. If liquidated damages are known to be insufficient the DOM has the right to pursue actual damages.

If the Contractor's failure to perform satisfactorily exposes DOM to the likelihood of contracting with another person or entity to perform services required of the Contractor under this contract, upon notice setting forth the services and retainage, DOM may withhold from the Contractor payments in an amount commensurate with the costs anticipated to be incurred. If costs are incurred, DOM shall account to the Contractor and return any excess to the Contractor. If the retainage is not sufficient, the Contractor shall immediately reimburse DOM the difference or DOM may offset from any payments due the Contractor. The Contractor will cooperate fully with the retained Contractor and provide any assistance it needs to implement the terms of its agreement for services for retainage.

## INDEMNIFICATION

To the fullest extent allowed by law, the Consultant shall indemnify, defend, save and hold harmless, protect, and exonerate the Division, its employees, agents, and representatives, and the State of Mississippi from and against all claims, demands, liabilities, suits, actions, damages, losses, and costs of every kind and nature whatsoever including, without limitation, court costs, investigative fees and expenses, and attorney's fees, arising out of or caused by the Consultant and/or its partners, principals, agents, employees in the performance of or failure to perform this agreement. In the Division's sole discretion, the Consultant may be allowed to control the defense of any such claim, suit, etc. In the event the Consultant defends said claim, suit, etc., the Consultant shall use legal counsel acceptable to the Division. The Consultant shall be solely responsible for all costs and/or expenses associated with such defense, and the Division shall be entitled to participate in said defense. The Consultant shall not settle any claim, suit, etc. without the Division's concurrence, which the State shall not unreasonably withhold.

## HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996

All activities under this Agreement shall be performed in accordance with all applicable federal and/or state laws, rules and/or regulations including the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, Title XIII of Division A, and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, and their implementing regulations at 45 C.F.R. Parts 160, 162, and 164, involving electronic data interchange, code sets, identifiers, and the security and privacy of protected health information, as may be applicable to the services under this Agreement. Each party to this Agreement shall treat all data and information to which it has access under this Agreement as confidential information to the extent that confidential treatment of same is required under federal and state law and shall not disclose same to a third party without specific written consent of the other party. In the event that either party receives notice that a third party requested divulgence of the confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of the confidential or otherwise protected information, the party shall promptly inform the other party and thereafter respond in conformity with such subpoena as required by applicable state and/or federal law, rules, and regulations. The provision herein shall survive the termination of the Agreement for any reason and shall continue in full force and effect and shall be binding upon both parties and their agents, employees, successors, assigns, subcontractors, or any party claiming an interest in the Agreement on behalf of, or under, the rights of the parties following termination.

## INSPECTIONS

Consultant agrees that representatives of the Comptroller General, CMS, the General Accounting Office, the Statue Auditor, the Division and their authorized representatives shall have the right during regular business hours to inspect and copy Consultant's books and records pertaining to the extent and cost of services furnished to the Division or eligible recipients. The Consultant shall cooperate fully with the request from any of the agencies listed above and shall furnish free of charge copies of all requested records.

## RECORD RETENTION AND AUDIT PROCEDURES

The Consultant shall maintain financial records, supporting documents, statistical reports, and all other records pertinent to this program for a period of five (5) years from the day of the last payment made by the Division to the Consultant. However, if audit, litigation, or other legal action by or on behalf of the State or Federal Government has begun that is not completed at the end of the five (5) year period, or if audit findings, litigation, or other legal action has not been resolved at the end of the five (5) year period, the records shall be retained until resolution.

## TRANSPARENCY MISSISSIPPI

In accordance with the Mississippi Accountability and Transparency Act of 2008, Section 27-104-151, et seq., of the Mississippi Code of 1972, as amended, the American Accountability and Transparency Act of 2009 (P.L. 111-5), where applicable, and Section 31-7-13 of the Mississippi Code of 1972, as amended, where applicable, a fully executed copy of this agreement shall be posted to the State's accountability website at https://www.transparency.mississippi.gov.

## OWNERSHIP AND FINANCIAL DISCLOSURE

A. In accordance with 42 C.F.R. § 455.104(b), the Contractor shall disclose the following:

1. The name and address of any person (individual or corporation) with an ownership or control interest in the disclosing entity, DOM's fiscal agent, or managed care entity. The address for corporate entities must include as applicable primary business, every business location, and P.O. Box address;

2. Date of birth and Social Security Number (in the case of an individual);

3. Other tax identification number (in the case of a corporation) with an ownership or control interest in the disclosing entity (or DOM's fiscal agent or managed care

Page 9 of 14

entity ) or in any subcontractor in which the disclosing entity (or DOM's fiscal agent or managed care entity) has a 5 percent or more interest;

4. Whether the person (individual or corporation) with any ownership or control interest in the disclosing entity (or DOM's fiscal agent or managed care entity) is related to another person with ownership or control interest in the disclosing entity as a spouse, parent, child, or sibling; or whether the person (individual or corporation) with an ownership or control interest in any subcontractor in which the disclosing entity (or DOM's fiscal agent or managed care entity) has a 5 percent or more interest is related to another person with ownership or control interest in the disclosing entity as a spouse, parent, child, or sibling;

5. The name of any other disclosing entity (or DOM's fiscal agent or managed care entity) in which an owner of the disclosing entity (or DOM's fiscal agent or managed care entity) has an ownership or control interest; and.

6. The name, address, date of birth, and Social Security Number of any managing employee of the disclosing entity (or DOM's fiscal agent or managed care entity).

B. In accordance with 42 C.F.R. § 455.104(c), disclosures from the Contractor are due at any of the following times:

1. Upon the Contractor submitting a proposal in accordance with the State's procurement process;

2. Annually, including upon the execution, renewal, and extension of the contract with the State; and,

3. Within 35 days after any change in ownership of the Contractor.

C. In accordance with 42 C.F.R. § 455.104(d), all disclosures must be provided to DOM, the State's designated Medicaid agency.

D. In accordance with 42 C.F.R. § 455.104(e), federal financial participation (FFP) is not available in payments made to a disclosing entity that fails to disclose ownership or control information as required by said section.

E. In accordance with 42 C.F.R. § 455.105, the Contractor must fully disclose all information related to business transactions. The Contractor must submit, within 35 days of the date on a request by the Secretary or DOM, full and complete information about:

1. The ownership of any subcontractor with whom the Contractor has had business transactions totaling more than $25,000 during the 12-month period ending on the date of the request; and,

2. Any significant business transactions between the Contractor and any wholly owned supplier, or between the Contractor and any subcontractor, during the 5-year period ending on the date of the request.

F.  In accordance with 42 C.F.R. § 455.106(a), the Contractor must disclose to DOM the identity of any person who:

1. Has ownership or control interest in the Contractor, or is an agent or managing employee of the Contractor; and,

2. Has been convicted of a criminal offense related to that person's involvement in any program under Medicare, Medicaid, or the Title XX services program since the inception of those programs.

G.  In accordance with 42 C.F.R. § 455.106(b), DOM must notify the Inspector General of the Department of any disclosures under § 455.106(a) within 20 working days from the date it receives the information. DOM must also promptly notify the Inspector General of the Department of any action it takes on the Contractor's agreement and participation in the program.

H.  In accordance with 42 C.F.R. § 455.106(c), DOM may refuse to enter into or renew an agreement with a Contractor if any person who has an ownership or control interest in the Contractor, or who is an agent or managing employee of the Contractor, has been convicted of a criminal offense related to that person's involvement in any program established under Medicare, Medicaid or the Title XX Services Program. Further, DOM may refuse to enter into or may terminate a Contractor agreement if it determines that the Contractor did not fully and accurately make any disclosure required under 42 C.F.R. § 455.106(a).

I.  In accordance with 42 C.F.R. § 455.436, the State Medicaid agency and all Medicaid contractors shall do the following:

1. Confirm the identity and determine the exclusion status of contractors/subcontractors and any person with an ownership or control interest or

who is an agent or managing employee of the contractor/subcontractor through routine checks of federal databases; and,

2. Consult appropriate databases to confirm identity of the above-mentioned persons and entities by searching the List of Excluded Individuals/Entities (LEIE) and the System for Award Management (SAM) upon enrollment, re-enrollment, credentialing, or re-credentialing, and no less frequently than monthly thereafter, to ensure that the State does not pay federal funds to excluded persons or entities.

## ARTICLE V
## TERM OF THE CONTRACT

This Contract shall begin on July 1, 2013 and shall terminate on June 30, 2014, unless the contract is terminated earlier pursuant to the provisions described in Article IV of this Contract.

## ARTICLE VI
## MODIFICATIONS

No modification or change of any provision in this Contract shall be made, or construed to have been made, unless such modification or change is mutually agreed upon in writing by the Contractor and DOM. The agreed upon modification or change will be incorporated as a written contract amendment and processed through DOM for approval prior to the effective date of such modification or change. The only representatives authorized to modify this Contract on behalf of DOM and the Contractor are as follows:

Contractor:   Member, 4400 Cox Road, Suite 110, Glen Allen, VA 23060.

DOM:   Executive Director, 550 High Street, Suite 1000, Jackson, Mississippi 39201.

## ARTICLE VII
## NOTICES

Notices under this Contract shall be addressed as follows:

A.   In case of notice to the Contractor:

Charles T. Smith, III
Myers and Stauffer, LC
4400 Cox Road, Suite 110
Glen Allen, VA 23060

Page 12 of 14

B.     In case of notice to DOM:

Executive Director
Division of Medicaid
550 High Street, Suite 1000
Jackson, Mississippi 39201

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in duplicate originals on the day herein written.

DIVISION OF MEDICAID
OFFICE OF THE GOVERNOR
STATE OF MISSISSIPPI

BY: _____

DAVID J. DZIELAK, Ph.D.
EXECUTIVE DIRECTOR

MYERS AND STAUFFER, LC

BY: _____

CHARLES T. SMITH, III
MEMBER

BY: _____

SECRETARY OF THE
CORPORATION

(CORPORATE SEAL)

**STATE OF MISSISSIPPI**
**COUNTY OF HINDS**

THIS DAY personally came and appeared before me, the undersigned authority, in and for the aforesaid jurisdiction, the within named, **David J. Dzielak, Ph.D.,** in his official capacity as the duly appointed Executive Director of the Division of Medicaid in the Office of the Governor, an administrative agency of the State of Mississippi, who acknowledged to me, being first duly authorized by said Division that he signed and delivered the above and foregoing written Contract for and on behalf of said Division and as its official act and deed on the day and year therein mentioned.

GIVEN under my hand and official seal of office on this the _____$9+h$_____ day of _____ .A.D., 2013.

Pamela M. Chang
NOTARY PUBLIC

My Commission Expires:

July 9, 2014

**STATE OF** _____
**COUNTY OF** _____

THIS DAY personally came and appeared before me, the undersigned authority, in and for the aforesaid jurisdiction, the within named, **Charles T. Smith, III,** who acknowledged that he is a member of Myers and Stauffer, LC, a corporation authorized to do business in Mississippi, who acknowledged to me, being first duly authorized by said corporation that he signed and delivered the above and foregoing written Contract for and on behalf of said limited company, and as its official act and deed on the day and year therein mentioned, after first having been duly authorized by said limited company so to do.

GIVEN under my hand and official seal of office on this the _____ day of _____ .A.D., 2013,

NOTARY PUBLIC

My Commission Expires:

 **BRADLEY ARANT**
**BOULT CUMMINGS**

T. Richard Roberson, Jr.
Direct: (601) 592-9910
rroberson@babc.com

February 12, 2015

## VIA HAND DELIVERY

David J. Dzielak, Ph.D.
Executive Director
Mississippi Division of Medicaid
550 High Street, Suite 1000
Jackson, Mississippi 39201



> RE: DSH Audit for Pioneer Health Services, Inc. Hospitals
> Pioneer Community Hospital of Aberdeen (Medicaid #00220692)
> SE Lackey Community Hospital (Medicaid #00220324)

Dear Dr. Dzielak:

On behalf of my client, Pioneer Health Services, Inc. and two of its hospitals, Pioneer Community Hospital of Aberdeen ("Aberdeen") and S.E. Lackey Memorial Hospital ("Lackey") we file this supplement to our appeal dated January 16, 2015.

By letter dated January 28, 2015, signed by William C. Purdie, Director of Appeals, the Division of Medicaid ("Medicaid") purports to deny the appeal filed by Aberdeen and Lackey on January 16, 2015. Medicaid claims that an appeal "must explain the reasoning and factual support for the provider's position and pertain to an appealable issue. In this specific case, Medicaid claims that such would be any facts that show the provider's overpayment computation was performed incorrectly." With its response, Medicaid is denying due process to Aberdeen and Lackey.

The DSH audit findings reveal that Aberdeen was underpaid and that Lackey was overpaid. Medicaid is attempting to recoup overpayments from Lackey, but does not intend to repay Aberdeen its underpayment. Our appeal does not challenge the dollar amounts assigned to each audit, except to say that at the time the DSH payments were made, the numbers used to determine the payments were accurate and complied with state and federal regulations. However, in our appeal we raise important questions of whether Medicaid's DSH Audit program complies with federal law regarding the selection of its DSH Audit contractor. In addition, we raise other issues in this supplement that deserve to be heard on appeal.

We believe that the State has not complied with the federal requirements described in 42 C.F.R. 455.301 and 455.304 that the entity conducting the DSH Audit, Myers and Stauffer, be an "independent certified auditor" because Myers and Stauffer is the same entity with whom the Division of Medicaid has contracted to administer the DSH program. In guidance issued by



**EXHIBIT**

**D**

CMS at http://www.medicaid.gov/medicaid-chip-program-information/by-topics/financing-and-reimbursement/downloads/additionalinformationonthedshreporting.pdf, CMS makes it clear that the intent of the independent certified audit requirement is "for the auditor to be fully able to render objective and impartial judgment on all matters relating to a required DSH audit." The guidance further explains that "examples of potential conflicts for audit entities would be: calculating a State's DSH payments under the Medicaid State plan; developing State plan DSH payment methodologies for States; . . . . and possessing a direct or indirect financial interest in the State's DSH program."

Clearly Myers and Stauffer does not satisfy the "independent certified audit" requirement. Myers and Stauffer was under contract with the Division of Medicaid to administer the DSH and UPL Payment program during the applicable audit period – DSH Year 2011. This creates an obvious conflict of interest and does not satisfy the federal requirements. Since the agency is administering an audit program that violates federal law, it is without any authority to demand repayment of from Lackey.

The Division of Medicaid is an administrative agency of the State of Mississippi. It is well settled under Mississippi law that "administrative agencies have only such powers that are expressly granted to them or those necessarily implied via their grant of authority." See *Mississippi Pub. Serv. Comm'n v. Columbus & Grenville Railway Company*, 573 So.@d 1343, 1346 (Miss. 1990), citing *Pittman v. Mississippi Pub. Serv. Comm'n*, 538 So.@d 367, 373 (Miss. 1989). And, "any such power exercised by an administrative agency must be found within the four corners of the statute under which it operates." *Id.* at 1346,1347, citing *Strong v. Bostick*, 420 So.2d 1356, 1361 (Miss. 1982); *Mississippi Milk Comm'n v. Winn Dixie*, 235 So.2d 684 (Miss. 1970). Through its State Plan, Medicaid is authorized and required to operate its program consistent with applicable federal laws. See, *Miss. Code Ann. § 43-13-121 (2014)*. Medicaid's contractor for the DSH Audit program does not satisfy the requirements of federal law. By failing to satisfy the federal requirements, Medicaid lacks the authority to administer its DSH Audit program, much less demand reimbursement from Lackey.

Regardless of its authority to operate its DSH Audit program, if Medicaid has determined that Aberdeen has been underpaid for services, then it has a duty under state law to reimburse Aberdeen for the additional DSH payment. Mississippi Code Sections 43-13-117(A)(18)(a) and 43-13-145(12) require that Medicaid maximize the amount of DSH monies available to hospitals. Having discovered an underpayment to Aberdeen, Medicaid is compelled by state law to maximize the DSH funds and pay those funds to Aberdeen. Failure to reimburse Aberdeen clearly violates Mississippi law. Federal law does not supersede state law in this instance and does not

Finally, both Aberdeen and Lackey relied to their detriment on data provided by Medicaid and Myers and Stauffer to determine the applicable DSH payments during DSH audit year 2011. Medicaid and Myers and Stauffer determined the data to be used in the calculation. At the time the data was provided, the data was accurate and was used by Medicaid and Myers and Stauffer to determine the DSH payments. The data used to determine the DSH year 2011 payments represented the best available information for that year's DSH payment. Such methodology and calculation conformed with all requirements for the DSH program under both

state and federal regulations. Furthermore, upon information and belief, the distribution of the DSH payments was approved by the Centers for Medicare and Medicaid Services. Lackey relied upon the representations of Medicaid, Myers and Stauffer and CMS that such payments were accurate and properly approved. As such, Medicaid is equitably estopped from seeking reimbursement for or collecting any such overpayment from Lackey absent some intentional misrepresentation by Lackey. To our knowledge, no intentional misrepresentation has been alleged.

For the reasons stated above, we request a fair hearing to resolve these matters.

We reserve the right to raise other issues arguments by amending this appeal upon discovery of additional information.

Respectfully,

T. Richard Roberson, Jr.

cc:    William C. Purdie, Esq.
       Joseph L. McNulty, II

OFFICE OF THE GOVERNOR

Walter Sillers Building | 550 High Street, Suite 1000 | Jackson, Mississippi 39201



March 13, 2015

MISSISSIPPI DIVISION OF
**MEDICAID**

*VIA CERTIFIED MAIL*

T. Richard Roberson, Jr.
Bradley Arant Boult Cummings, LLP
188 East Capitol Street, Suite 400
Jackson, Mississippi 39201

Re:    Request for Administrative Hearing
       S.E. Lackey Memorial Hospital
       Pioneer Health Services, Inc.

Mr. Roberson:

This letter is in response to your February 12, 2015, letter supplementing your January 16, 2015, administrative appeal request on behalf of S.E. Lackey Memorial Hospital ("Lackey") and Pioneer Community Hospital of Aberdeen ("Aberdeen"). Your appeal is granted, in part, and denied, in part.

In regards to the issue you raised of auditor independence, your appeal is denied. As previously explained, this is not an appealable issue arising from the December 19, 2014, recoupment letter. As to the issue raised of whether DOM disbursement methodology for DSH underpayments is in compliance with applicable law and policy, your appeal is granted. Lastly, your appeal is granted with respect to the issue you have raised concerning the data set used to perform the DSH audit.

If you have any questions, please don't hesitate to contact me at (601) 576-4169 or William.purdie@medicaid.ms.gov.

Sincerely,

William C. Purdie, JD
Director of Appeals

WCP/sl

cc:    Margaret King, CPA, DOM
       Michael Daschbach, DOM
       Tara S. Clark, JD, CHP, DOM



**EXHIBIT**

E

## IN THE CHANCERY COURT OF HINDS COUNTY, MISSISSIPPI
### FIRST JUDICIAL DISTRICT

PIONEER HEALTH SERVICES, INC.

**PLAINTIFF**

CAUSE NO. _G 2015. 510 ⁴⁰/₄ₚ_

v.

MISSISSIPPI DIVISION OF MEDICAID,
OFFICE OF THE GOVERNOR, STATE OF
MISSISSIPPI

**DEFENDANT**

### SUMMONS

THE STATE OF MISSISSIPPI

TO:   Mississippi Division of Medicaid
c/o The Honorable Jim Hood, Attorney General
550 High Street, Suite 1200
Jackson, Mississippi 39201

### NOTICE TO DEFENDANT

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

You are required to mail or hand-deliver a copy of a written response to the Complaint to T. Richard Roberson, Esquire, the attorney for the Plaintiff, whose post office address is Post Office Box 1789, Jackson, Mississippi 39215-1789, and whose street address is 188 East Capitol Street, Suite 400, Jackson, Mississippi 39201. Your response must be mailed or delivered within (30) days from the date of delivery of this summons and complaint or a judgment by default will be entered against you for the money or other things demanded in the complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

Issued under my hand and the seal of said Court, this 13 day of April, 2015.

_____
DEPUTY CLERK

(SEAL)

4/445998.1